**In the Matter of The MANSFIELD TIRE & RUBBER COMPANY, Debtor.**

**In the Matter of PENNSYLVANIA TIRE & RUBBER COMPANY OF MISSISSIPPI, INC., Debtor.**

**In the Matter of PENNSYLVANIA TIRE COMPANY, Debtor.**

**Bankruptcy Nos. 679–01238, 679–01239 and 679–01333.**

United States Bankruptcy Court, N.D. Ohio.

Aug. 18, 1986.

---

## MEMORANDUM OF DECISION

JAMES H. WILLIAMS, Bankruptcy Judge.

The court has before it fifteen applications for compensation and reimbursement

of expenses, presented by or on behalf of a variety of attorneys and accountants for services performed in connection with the reorganization efforts of the three debtor corporations. The applications, in sum, seek in excess of 3.5 million dollars as compensation for services rendered and reimbursement of expenses totaling more than $83,000.00.

In order to afford the applicants full opportunity to present and substantiate their claims, the court, on notice to the more than 4,000 creditors in the case and all other parties in interest, set aside the majority of one week for evidentiary hearings on all of the applications. Each applicant was admonished to be fully prepared to present such corroborating evidence as might be necessary to substantiate his or its claim. The hearings proceeded on schedule.[1] The court now turns to the task of analyzing the supporting data in light of the written and oral commentary offered in support of and in opposition to each application.[2]

# I

## History of the Cases [3]

Requests for compensation of the magnitude of those before us obviously bespeak a lengthy and complicated administration, the history and results of which should be summarized in order to provide a framework for the conclusions reached by the court on the issues before it.

## A

### The Debtors

Mansfield Tire & Rubber Company (MTR), a publicly held corporation, was the parent organization of Pennsylvania Tire and Rubber Company of Mississippi, Inc. (Penn-Miss) and Pennsylvania Tire Company (Penn-Ohio). (Sometimes, hereinafter, referred to as the debtors.) Financial difficulties, rooted largely in plant obsolescence, a declining market and severe competition, domestic and foreign, led to the filing, on October 1, 1979, of petitions for relief under Chapter 11 of Title 11 of the United States Code (sometimes hereinafter referred to as the Bankruptcy Code or Code) for MTR and Penn-Miss.[4] A similar petition on behalf of Penn-Ohio followed on November 1, 1979.[5]

## B

### Counsel and Other Professionals

By order of the court, entered on the day of each filing, the Cleveland, Ohio law firm

---

**1.** Despite the breadth of notice, which detailed the amounts sought, not a single creditor or interested party, other than the applicants, appeared at any of the hearings.

**2.** No independent evidence as to the reasonableness of the hours spent or rates per hour charged was offered by any applicant, beyond the representative's own, obviously self-serving conclusions in that regard. Objections were filed by the Disposition Assets Trustees, (whose role in the case will be described later) but were, for the most part, formalistic in nature and not actively pursued at the hearing. The one exception was with respect to the application of Baker & Hostetler, counsel for debtors and debtors in possession, whose representatives were cross-examined by the Trustees' counsel.

**3.** Until consolidation of the cases was effected as a part of the confirmed plan of reorganization, the three Chapter 11 cases were administered separately. From time to time herein, the

debtors and their cases may be referred to in the singular.

**4.** The filing date coincided with the effective date of the Bankruptcy Reform Act of 1978. (11 U.S.C. § 101 *et seq.*) Counsel and the court were, at least for a brief period, confronted with the difficulties of sailing through uncharted waters insofar as new concepts were introduced by the Bankruptcy Code, as the new legislation came to be called. Statutory references, unless otherwise noted, will be to Sections of Title 11.

**5.** MTR had five other wholly-owned subsidiaries and one of those, Mansfield International, Inc., in turn had a wholly-owned subsidiary, M.T. R.C. Limited, Inc. in England. Of these only one was further dealt with in bankruptcy: Inland Rubber Corp., an Ohio corporation, filed a petition for relief under Chapter 7 on September 30, 1982 and was thus liquidated.

of Baker & Hostetler was retained as counsel for each debtor. A plethora of issues arose, calling for the expertise of a variety of legal and financial specialists. Baker & Hostetler, for instance, provided counsel experienced, in addition to bankruptcy and creditors' rights law generally, in corporate and securities law, workers' compensation law, labor and pension law, tax law and litigation. A number of products liability actions were pending at various points around the country and their defense required the attention of special counsel in those localities.

Committees of unsecured creditors were appointed in the MTR and Penn-Miss cases and each hired its own counsel, Guy, Mentzer & Towne, nka Guy, Lammert & Towne (GM & T) of Akron, Ohio and Benesch, Friedlander, Coplan & Aronoff, of Cleveland, Ohio (Benesch, Friedlander), respectively. Accountants were retained by the debtors, the Penn-Miss creditors' committee and, subsequent to his appointment on August 11, 1981, by Samuel Krugliak, the trustee of MTR. The trustee also was permitted to retain, in addition to Baker & Hostetler, his own law firm, Krugliak, Wilkins, Griffiths & Dougherty of Canton, Ohio (Krugliak, Wilkins) as his counsel. Special counsel, Day, Ketterer, Raley, Wright & Rybolt of Canton, Ohio (Day, Ketterer) was hired to collect outstanding accounts receivable. Hillsinger & Costanzo of Los Angeles, California was retained to conduct certain litigation pending in that state at the filing of these proceedings.

The debtors' operations included tire manufacturing plants in Mansfield, Ohio and Tupelo, Mississippi, a molded wood fiber production facility in Springfield, Tennessee which produced, primarily, components for the automobile industry, and a tire manufacturing operation in India. Most, if not all of the operations were shut down or in the process of closing at the time the petitions for relief were filed. Ultimately, all holdings were disposed of, the assets were converted to cash, a Reorganization Trust was formed and co-trustees, designated Disposition Assets Trustees, were appointed, all as a part of a plan

confirmed by the court on December 30, 1985.

\* \* \*

This greatly condensed and necessarily truncated history of these proceedings omits reference to literally hundreds of hearings before the court, many brief and perfunctory, to be sure, but others, notably resistance by MTR and its creditors' committee to the claims of secured creditors, Equitable Life Assurance Society of the United States (Equitable) and Aetna Life Insurance Company (Aetna), matters relating to the sale or attempted sale of various assets and transactions involving a proposed purchaser of certain assets, an entity known as United Capital Corporation and its related entities, consumed many days of trial, involved extensive briefing and resulted, in some instances, in appeals.

## II

### The Plan

The confirmed plan calls for the payment of administrative expenses and priority claims of approximately 3.554 million dollars in full on confirmation and a pro-rata distribution to unsecured creditors, which is estimated to amount to approximately 33% to holders of allowed general unsecured claims against Penn-Miss, which claims are estimated to total 7.79 million dollars, and 24% to MTR's holders of allowed general unsecured claims which total some 9.206 million dollars.

## III

### Discussion

The court's function now, in dealing with the instant applications, is to weigh the price ultimately to be borne by the unsecured creditors of these entities for the results obtained. Indeed, as necessarily found in the confirmation process, results superior to those available via liquidation have been attained. Should more have been accomplished at less cost in less time? The layman, particularly if he happens to be an unsecured creditor who has waited

nearly seven years to recover a portion of his due, would presumably answer in the affirmative. Should all concerned be grateful for these results and not be so niggardly as to challenge any of the requests? There is little doubt as to the response of the applicants to such a question as that!

Fortunately or otherwise, we do not any longer plow virgin territory as has often been the case in the instant matters. Much has been written, not all of it consistent, on the subject of professional compensation, particularly in bankruptcy cases. A legal frame of reference, by no means exhaustive, will follow.

## A

### *Applicable Law*

#### 1

#### *Statutory Provisions*

Several provisions of the Bankruptcy Code come into play in retaining and compensating various officers and professional persons necessary to the administration of an estate. For instance, Section 327 provides:

(a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

· · · · ·

(d) The court may authorize the trustee to act as attorney or accountant for the estate if such authorization is in the best interest of the estate.

(e) The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

· · · · ·

Section 1103, in subsection (a) confers the power granted by Section 327 to a trustee and debtor in possession on creditors' committees:

At a scheduled meeting of a committee appointed under section 1102 of this title, at which a majority of the members of such committee are present, and with the court's approval, such committee may select and authorize the employment by such committee of one or more attorneys, accountants, or other agents, to represent or perform services for such committee.

Finally, the trustee has brought forward applications on behalf of several law firms under Section 503(b):

After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.

· · · · ·

(2) compensation and reimbursement awarded under section 330(a) of this title;

· · · · ·

In addition to providing a statutory vehicle for the employment of professionals and others, Congress has addressed the matter of their compensation:

Section 326

(a) In a case under chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed fifteen percent on the first $1,000 or less, six percent on any amount in excess of $1,000 but not in excess of $3,000, three percent on any amount in excess of $3,000 but not in

excess of $20,000, two percent on any amount in excess of $20,000 but not in excess of $50,000, and one percent on any amount in excess of $50,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest excluding the debtor, but including holders of secured claims.[6]

.    .    .    .    .

Section 328

(a) The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments unanticipatable at the time of the fixing of such terms and conditions.

(b) If the court has authorized a trustee to serve as an attorney or accountant for the estate under section 327(d) of this title, the court may allow compensation for the trustee's services as such attorney or accountant only to the extent that the trustee performed services as attorney or accountant for the estate and not for performance of any of the trustee's duties that are generally performed by a trustee without the assistance of an attorney or accountant for the estate.

.    .    .    .    .

Section 330

(a) After notice to any parties in interest and to the United States trustee and a hearing, and subject to sections 326, 328, and 329 of this title, the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—

(1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

.    .    .    .    .

Recognizing the hardship a lengthy administration may work upon a professional person if compelled to await its conclusion before being paid, interim compensation is authorized by Section 331 and the applicants here who have had heavy involvement in the case have availed themselves of that opportunity. All applicants have been aware, however, that such awards of interim compensation as have been allowed are subject to final review by the court and this review, in fact, will encompass all efforts by the applicants from the outset of their work on the case or cases.

*2*

*Judicial Interpretations*

Several years ago, in class action litigation arising out of alleged violations of the Sherman Act, the Third Circuit created the commonly described "lodestar" approach to calculating fee awards. *See, Lindy Brothers Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3rd Cir.1973) *appeal following remand,* 540 F.2d 102 (3rd Cir. 1976). Under the *Lindy* approach, the court must determine the number of hours reasonably expended by counsel and multiply that number by a reasonable hourly

---

6. As effective on October 1, 1979. The subsection was amended by the Bankruptcy Amendments and Federal Judgeship Act of July 10, 1984 which specifically makes the Amendment, and thus its greater rate of compensation, effective as to cases filed 90 days after July 10, 1984.

rate for the services rendered. Rates, of course, would vary, depending upon the attorney's experience, reputation and similar factors. 487 F.2d at 167. Increases and decreases in the lodestar thus calculated were permitted for the contingent nature of the work, the risks of the case and the quality of the work.

The *Lindy* lodestar approach has not been unanimously followed by the circuits. The Fifth Circuit, in its often cited decision in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), adopted a twelve-factor scale in lieu of the *Lindy* method.[7] The Ninth Circuit followed the Fifth. *See, Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir.1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976). The Fifth Circuit made its *Johnson* approach applicable to bankruptcy cases in *In re First Colonial Corporation of America*, 544 F.2d 1291 (5th Cir.) *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977).

A number of bankruptcy courts have followed the Fifth Circuit's lead. *See, e.g., Harman v. Levin*, 772 F.2d 1150 (4th Cir. 1985); *In re Whitman*, 51 B.R. 502 (Bankr. D.Mass.1985); *In re Werth*, 32 B.R. 442 (Bankr.D.Colo.1983); *In re Rego Crescent Corp.*, 37 B.R. 1000 (Bankr.E.D.N.Y.1984); *In re Cafferky*, 39 B.R. 330 (Bankr.M.D. Tenn.1984).

Within this judicial district, Bankruptcy Judge O'Neill, in *In re White Motor Credit Corp.*, 50 B.R. 885 (Bankr.N.D.Ohio 1985) merged the approaches, declaring that "[d]etermination of the reasonable hourly rate and number of hours expended requires consideration of the *Johnson* factors.... The Lodestar is then adjusted up or down to reflect factors which have not been considered." *Id.* at 890.

The *White Motor* approach must be carefully limited in the light of this circuit's expressed skepticism about the *Johnson* factors. For example, in *Northcross v. Board of Education of Memphis City Schools*, 611 F.2d 624 (6th Cir.1979), *cert. denied* 447 U.S. 911, 100 S.Ct. 3000, 64 L.Ed.2d 862 (1980), the court reviewed the twelve *Johnson* factors and then said:

We have learned through experience, however, that merely providing a check list of factors to consider does not lead to consistent results, or, in many cases, reasonable fees. Many of the factors are overlapping, and there is no guidance as to the relative importance of each factor, or indeed, how they are to be applied in a given case. We conclude that an analytical approach, grounded in the number of hours expended on the case, will take into account all the relevant factors, and will lead to a reasonable result. The number of hours of work will automatically reflect the "time and labor involved," "the novelty and difficulty of the question," and "preclusion of other employment." The attorney's normal hourly billing rate will reflect "the skill requisite to perform the legal service properly," "the customary fee," and the "experience, reputation and ability of the attorney." Adjustments upward may be made to reflect the contingency of the fee, unusual time limitations and the "undesirability" of the case. Thus, applying the approach used in this decision will result in an award reflecting those considerations traditionally looked to in making fee awards, but will also provide a logical, analytical framework which should largely eliminate arbitrary

---

7. The twelve factors are:
   (1) the time and labor required;
   (2) the novelty and difficulty of the questions involved;
   (3) the skill requisite to perform the legal service properly;
   (4) the preclusion of other employment by the attorney due to acceptance of the case;
   (5) the customary fee;
   (6) whether the fee is fixed or contingent;

(7) time limitations imposed by the client or the circumstances;
(8) the amount involved and the results obtained;
(9) the experience, reputation, and ability of the attorneys;
(10) the "undesirability" of the case;
(11) the nature and the length of the professional relationship with the client;
(12) awards in similar cases.

awards based solely on a judge's predispositions or instincts.

*Northcross* at 642–3.

The Sixth Circuit spoke again, to the same effect, in *Kelley v. Metropolitan County Board of Education,* 773 F.2d 677 (6th Cir.1985) *cert. denied,* — U.S. ——, 106 S.Ct. 853, 88 L.Ed.2d 893 (1986). Quoting the above language from *Northcross* with approval, the court said:

> Fairly read, *Northcross* advises that the attorney's normal hourly billing rate should be a key focal point in award determinations. In the recent case of *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), the Supreme Court further instructed that "reasonable rates" are to be determined under § 1988 "according to the prevailing market rates in the relevant community." 104 S.Ct. at 1547.

*Kelley* at 683.

More recently, in *Murphy v. International Union of Operating Engineers,* 774 F.2d 114 (6th Cir.1985) *cert. denied,* — U.S. ——, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986), the court, at page 128, noted that it "expressly rejected this [*Johnson*] checklist approach to fee determinations" in the *Northcross* case and pointed out that it "held a district court need only consider the hours of service provided (and whether those hours were reasonable under the circumstances) and a reasonable rate of compensation."

In reaching its conclusion in *Murphy,* the court considered the Supreme Court's holding in *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) and found that *Hensley* neither approves a checklist approach nor disapproves the Sixth Circuit's method of addressing the problem as expressed in *Northcross.*

Indeed, in *Hensley,* a civil rights case, the Court said, at pages 443–4, 103 S.Ct. at pages 1944–45:

> The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.
>
> The district court also should exclude from this initial fee calculation hours that were not "reasonably expended." S Rep No. 94–1011, p 6 (1976). Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Copeland v Marshall,* 205 US App DC 390, 401, 641 F2d 880, 891 (1980) (en banc) (emphasis in original).

### B

The product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the "results obtained." This factor is particularly crucial where a plaintiff is deemed "prevailing" even though he succeeded on only some of his claims for relief. In this situation two questions must be addressed. First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?

After noting that "excellent results" and "exceptional success" might even justify a so-called enhanced award, the court, at pages 436–7, 103 S.Ct. at page 1941, discussed the consequences of partial or limited success:

> If, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill. Again, the most critical factor is the degree of success obtained.

> .      .      .      .      .

> There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment. This discretion, however, must be exercised in light of the considerations we have identified.

A bankruptcy case which appears to well summarize and coalesce differing approaches to the general subject of compensation of professionals is *In re Penn-Dixie Industries, Inc.*, 18 B.R. 834 (Bankr.S.D.N.Y.1982). There, Bankruptcy Judge Lifland, after reviewing the results of the Chapter 11 filing of the debtor, "a major national cement manufacturer," and Penn-Dixie Steel Corporation, "a primary steel manufacturer" and a subsidiary of the debtor,[8] observed, at pages 838–9:

While the spirit of strict economy of the Bankruptcy Act of 1898 has been abandoned—in other respects prior case law still applies. Thus while authority for the so-called bankruptcy haircut has been eliminated, a tolerance for profligacy will not be countenanced. The criteria for fee awards variously stated contain three main elements: (1) the quantity factor: documented time spent and customary billing rates; (2) the quality factor: the quality of advocacy required and delivered, taking into account the novelty and difficulty of the issues presented, skills called for, time constraints, and counsel's personal qualifications; (3) the result factor: the bottom line amount recovered for the estate and its creditors (as well as the degree of speed from loss to recovery). Buteneas, *Establishing Attorney's Fees Under the Bankruptcy Code*, 37 Business Lawyer 77 (1981). Consideration of these broadly stated fee formulation factors permits the court to focus on a firm's baseline time charges, and for cause, modestly enhance *or* sharply curtail them. In the instant cases, with one previously noted exception, the requested enhancements to the regular mixed hourly charges are modest. Analysis of the case law confirms that rigidity in the application of fee guidelines has never been the rule. Thus, courts have generally been free to ponder all the variables of a particular case and avoid ill-suited emphasis on a particular guideline.

■ In summary, this court perceives its task to be "to develop a lodestar figure for the services rendered by determining the number of hours that will be compensated and then multiplying the number of hours by the hourly rate allowed for the [applicant] in question." *Akron Center*

---

**8.** Although certainly not controlling, the results obtained in *Penn-Dixie,* and the time within which they were accomplished stand in startling and interesting contrast to the liquidation end of these seven year old cases. As recounted by the court, creditors of *Penn-Dixie* would realize, effectively, a 100% recovery within two years of filing and a viable, stable reorganized entity would survive with a significant equity interest retained by the original shareholders. The alternative, in the court's view, would have "resulted in liabilities in excess of $2,000,000.00 with minimal recovery to creditors and none to the public shareholders." (Page 836) The court approved some $3,900,000.00 in compensation awards, substantially all that was requested.

*for Reproductive Health v. City of Akron,* 604 F.Supp. 1275, 1286 (N.D.Ohio 1985); *Northcross v. Board of Education of Memphis City Schools, supra.* It will then consider the impact of such matters as the "quality" and "result" factors as identified in *Penn-Dixie Industries, Inc., supra.* In pursuit of its task, the court is to bear in mind that the burden of proof to establish the entitlement to and reasonableness of a fee is upon the professional seeking compensation. *In re Aldersgate Foundation, Inc.,* 10 B.R. 910 (Bankr.M.D.Fla.1981), citing *Woods v. City National Bank & Trust Co.,* 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820, *reh'g. denied,* 312 U.S. 715, 61 S.Ct. 736, 85 L.Ed. 1145 (1941). The court is not compelled to award fees requested merely because (as noted to be substantially the case here) no objections to a request are filed. *Matter of The Liberal Market, Inc.,* 24 B.R. 653 (Bankr.S.D.Ohio 1982); *In re Hamilton Hardware Co., Inc.,* 11 B.R. 326 (Bankr.E.D.Mich.1981). Indeed, *Northcross v. Board of Education of Memphis City Schools, supra,* is clear, as the District Court in *Akron Center for Reproductive Health v. City of Akron, supra* noted, in its instruction that, even where there is no objection raised to a fee application, the trial court is to independently examine the application.

This court has conducted such an examination, through the hearing process described at the outset of this opinion and by reviewing the voluminous applications presented. The individual requests will be dealt with next.

### B

### *The Applicants and Their Work: Observations*

### 1

### *Baker & Hostetler*

As earlier noted, the large and prominent Cleveland, Ohio law firm of Baker & Hostetler filed the subject reorganization proceedings on behalf of the debtors. The applications of Baker & Hostetler cover a time frame from September 24, 1979 through December 30, 1985. The documentation in support of the firm's application fills 381 pages of an Exhibit entitled "Comprehensive Application of Baker & Hostetler, Attorneys for Debtors, Debtors in Possession and Trustee, for Final Compensation and Reimbursement of Expenses" in the MTR case and somewhat smaller volumes in connection with the Penn-Miss and Penn-Ohio cases. The applications and their supporting data reveal, to the best of the court's ability to track the personnel and their charges, that the firm invested the time and talents of at least 73 partners, associates and paralegals in the effort on behalf of the debtors. Baker & Hostetler bills $1,763,638.50 for 20,174.75 hours expended on behalf of all three of the debtors.

While, in this day and age of powerful computers and sophisticated law office management systems which employ those splendid tools, it is no major accomplishment to produce a massive compilation of time and charges and even arrive at a readable, comprehensible result therefrom, it remains the province of the court to, as we have seen, attempt to assess the reasonableness of the product of what is, fundamentally, a multiplication problem in basic arithmetic. The Baker & Hostetler request founders, in the court's opinion, on the shoals of that assessment.

There is simply not time for the court and its limited staff to compare charges, item by item, individual by individual, case by case. Such is not believed by the court to be its burden. *See, Northcross v. Board of Education of Memphis City Schools, supra* at 641 ("Rather than attempt to pick out which hours of service were unnecessarily duplicative given the use of three attorneys, we elect simply to use a 5% reduction factor."); *Hensley v. Eckerhart, supra* 461 U.S. at 436–37, 103 S.Ct. at 1941; ("There is no precise rule or formula for making these determinations [of fee awards]. The District Court may attempt to identify specific hours that should be eliminated, *or it may simply reduce the award to account for the limited suc-*

*cess.*") (Emphasis added) *Akron Center for Reproductive Health v. City of Akron, supra* at 1284 ("In the Court's view the substantial but not complete success of plaintiffs' counsel requires a reduction in the hours claimed for the work accomplished at the District Court level. Following a review of the record, the Court concludes that the reduction on the basis of partial success should be twenty percent.")

The court's view of Baker & Hostetler's success or lack thereof will follow later. At this juncture, it is sufficient to note that a calculation of hours spent and adjustments thereto is not dependent upon a line by line examination of supporting data which are replete with entries such as:

| Date | Billing Attorney | Description of Service | Hours Charged |
|------|------------------|------------------------|---------------|
| 9–24–79 | Bryan | discussion . . . Collins, Fleming & Patchan | .25 |
| 9–24–79 | Patchan | conference with Collins, Fleming & Bryan | 3.00 |
| 9–24–79 | Collins | conference with Patchan Fleming & Bryan | 3.00 |

Thus, the estate is billed for 6.25 hours of professional time expended seven days before the filing, a large part of which involved discussions or conferences between Baker & Hostetler personnel. Similarly descriptive entries were made by attorneys Patchan and Collins in the Penn-Miss matter on the same date but, mercifully, each only billed 1.5 hours for those discussions.

A similar representative situation occurred on April 16, 1980 in connection with collection efforts on MTR's accounts receivable:

| Date Charged | Billing Attorney | Description of Service | Hours |
|--------------|------------------|------------------------|-------|
| 4–16–80 | Patchan | conference with Mr. Torgenson & Mr. Flink . . . | 1.50 |
| 4–16–80 | Torgenson | conference with Mr. Patchan & Mr. Flink . . . | 3.00 |
| 4–16–80 | Flink | . . . conference with Mr. Torgenson & Mr. Patchan . . . | 5.25 |

One day earlier, Baker & Hostetler attorneys recorded 13.75 hours of time expended on the MTR case, including individual charges for attorney Dowd conferring with attorney Patchan and vice versa, and Mr. Patchan conferring with Mrs. Collins and vice versa. On the same date, Messrs. Patchan and Dowd entered charges on the Penn-Miss case for conferring with each other. Mr. Dowd allocated a half hour's charge to the Penn-Ohio case for his April 15, 1980 conference with Mr. Patchan and Mrs. Collins charged the Penn-Ohio file for "Conference with Patchan to review correspondence and pleadings and prepare various documents; conference with Patchan re: disclosure statement; research re: same." The identical description supports her 2½ hour charge to the Penn-Miss case on the same date and a portion thereof (" . . . conference with Patchan re: disclosure statement; research re: same") is included in her April 15, 1980 charge to the MTR case. If the disclosure statement referred to was ever filed, it is sufficient for these purposes to note that it was not the one ultimately approved by the court for distribution to the creditors of these estates.

As will be discussed in greater detail *infra*, MTR's official creditors' committee, through its counsel, elected to attack the security interests of Equitable and Aetna and prevent those creditors from obtaining funds claimed due them under their security instruments. A four day trial took place in which Baker & Hostetler, through Mr. Patchan and Mrs. Collins, participated on behalf of the debtor. Each billed for 54.25 hours or $6,781.25 for Mr. Patchan at his then hourly rate of $125.00 and $4,340.00 for Mrs. Collins at her then hourly rate of $80.00. More than $11,000.00 in charges were thus incurred in time spent only in trial; preparation therefor and the debtor's role in prosecuting an appeal from the court's ruling in favor of the creditors are not included.

Overall, the thoroughness of Baker & Hostetler is impressive. A few areas stand out. For instance, there are the efforts of Belinda J. Scrimenti, then an associate, on

the issue of the executory nature of labor contracts. Between June 23, 1980 and July 17, 1980, Ms. Scrimenti spent 50.5 hours on this admittedly perplexing topic, including one Herculean effort on June 26, 1980 for which she billed 12.75 hours to the MTR case. In the course of her labors Ms. Scrimenti conferred with attorneys Brickman and Walker of the firm; that is verified by their corresponding entries for conferring with her on those occasions. Hopefully, the product of her time spent was not, as the application indicates, nine separate memoranda on the subject, but entries which in their entirety read "memo on rejection of labor contracts as executory" would lead one to so believe, for that notation, standing alone, appears six times and three times in tandem with her conferences with the other attorneys or in connection with her research. The need for Ms. Scrimenti's heavy concentration of time on this issue is all the more dubious in light of the fact that no rejection, so far as the docket of this court reveals, was ever effected.

The court has previously mentioned the impact of the filing of this case on the effective date of the Bankruptcy Reform Act of 1978. Certainly, the new legislation, to be administered under a new court system, presented unique, unprecedented problems with which the court and counsel had to struggle. However, the court deems it inappropriate to assess one case for the educational costs of counsel. The extensive research charges of many of the Baker & Hostetler personnel appear akin to those deemed incompensable in *In re Plunkett*, 60 B.R. 290 (Bankr.S.D.N.Y. 1986) wherein the court was moved to remark, at 294, "This court cannot compensate a professional for her education." *See, also, In re St. Pierre*, 4 B.R. 184 (Bankr.D.R.I.1980).

Samuel Krugliak was appointed trustee in the MTR case on August 11, 1981, thus considerably reducing Baker & Hostetler's involvement in the day-to-day administration of that case, although the firm was appointed to act as special counsel to the trustee on December 16, 1981. By the terms of that order, Baker & Hostetler's activities on behalf of the trustee were limited to "prosecuting and collecting specific accounts receivable, claims of the estate, major preference litigation, and other matters which may arise for which the trustee believe (sic) are best referred to Baker & Hostetler in the interest of economy to the Estate; ..." The court's examination of Baker & Hostetler's charges after its appointment as such special counsel reveals that the firm's activities have been limited to comply with the provisions of that order.

The firm has itself recognized that certain adjustments are appropriate. For instance, a credit of 50% of the time of partner Maurice M. Sayre has been made for an allowance for administrative overhead, recognizing the time spent by Mr. Sayre in coordinating the work of other attorneys. Numerous entries relative to the preparation of fee applications by paralegal personnel have been reduced to 60% of normal billing rates for those individuals. Generally, 1983 rates are the highest charged by Baker & Hostetler personnel, although the billing rates of most of those persons have, according to the applicant, increased since that time. Baker & Hostetler estimates that its voluntary adjustments amount to a reduction of more than $350,000.00 in its application.

The court has previously considered Baker & Hostetler's services in two areas that were regarded as severable from the overall estates. These are dubbed "transactional" fee applications by Baker & Hostetler and involve the firm's services in the collection of accounts receivable and in connection with the sale of the Tupelo, Mississippi plant. The result of that consideration was to award the full sums sought, $386,451.00 and $263,890.00, respectively.

As previously indicated, the court believes that a reduction factor in the Baker & Hostetler request is fitting for a number of reasons. First, as demonstrated, there appear to be numerous instances throughout the volumes of data detailing time charges of duplication of work where sev-

eral attorneys charged, in some cases more than one file, for the same work. Second, the hours spent, again as we have seen, appear to be excessive in some areas and represent overkill so far as these estates, which would eventually be liquidated, are concerned. Third, efforts aimed at compiling fee applications are believed by the court to be incompensable at the expense of a bankruptcy estate, whether or not performed by paralegals and whether or not at a reduced rate for the time expended.

The court is aware of a division of authority in the country on the issue of compensability, from the bankruptcy estate, of the time spent in preparing, advancing and recovering upon applications for compensation. The Ninth and Fifth Circuits appear to approve of such payments. *In re Nu-Corp Energy, Inc.*, 764 F.2d 655 (9th Cir. 1985); *Ross Pass Mines, Inc. v. Howard*, 615 F.2d 1088 (5th Cir.1980); *In re Braswell Motor Freight Lines, Inc.*, 630 F.2d 348 (5th Cir.1980).

So far as this Circuit is concerned, no pronouncement on the matter by our Court of Appeals has been discovered. This court, in two recent, unpublished opinions has rejected the concept of compensating lawyers for time spent on fee applications. *In re Deioma Trucking Co.*, No. 84–00979, slip op. (Bankr.N.D.Ohio April 22, 1986); *In re Pickering*, 66 B.R. 11 (Bankr.N.D.Ohio 1986). In so doing, it unfortunately appears to be in conflict with a sister court in the Northern District of Ohio as indicated by *In re Union Cartage Company*, 56 B.R. 174 (Bankr.N.D.Ohio 1986), at least to the extent that that court views an attorney's time in reviewing the fee application preparation by his staff to be compensable by the estate. Also, the bankruptcy court for the Middle District of Tennessee has approved compensation for what it emphasizes must be a reasonable number of hours in preparing a fee application. *In re Tolan*, 41 B.R. 751 (Bankr.M.D.Tenn.1984). (Holding that 24.9 hours spent preparing a 72–hour fee application is not reasonable).

Nonetheless, this court will adhere to its view that the seeking of fees and reimbursement of expenses is a cost of doing business which is of no benefit to the estate and is therefore non-compensable. In support of that view it looks to such cases as *In re White Motor Credit Corporation, supra; In re Holthoff*, 55 B.R. 36 (Bankr.E.D.Ark.1986); *In re Four Star Terminals, Inc.*, 42 B.R. 419 (Bankr.D. Alaska 1984); *Matter of The Liberal Market, Inc.*, 24 B.R. 653 (Bankr.S.D.Ohio 1982).

Finally, it is to be remembered that today all that is left of the once-thriving MTR plant in Mansfield, Ohio are a few small buildings and several acres of vacant land. The company's demise is most certainly not the fault of Baker & Hostetler; neither, however, can Baker & Hostetler point to a *Penn-Dixie* or a *White Motor* type of result in support of its application. The result factor, as articulated by Judge Lifland in the *Penn-Dixie* case ("the bottom line amount recovered for the estate and its creditors (as well as the degree of speed from loss to recovery)"), is largely missing from the facts before us.

The court believes that a reduction of 25% in the number of hours billed by Baker & Hostetler, excluding the "transactional" activities, already considered and ordered paid, is appropriate. Therefore, from the total number of hours billed of 20,174.75, the court deducts the 6,995.75 hours it allowed to be compensated in the "transactional" matters and reduces the balance of 13,179 hours by 25%, or 3,294.75 hours. The remainder of 9,884.25 hours will be allowed at the firm's composite rate of $87.42 per hour which the court finds to be reasonable. The court thus approves a final award to Baker & Hostetler of $864,081.14, plus the $263,890.00 it allowed for the work on the sale of the Tupelo plant and $386,451.00 previously authorized to be paid for the work in collecting the accounts receivable of the debtors, or a grand total of $1,514,422.14. Additionally, the court will award Baker & Hostetler reimbursement of $10,920.08 in unpaid expenses in-

curred by the firm, authorizes payment of that sum and ratifies previously awarded expense allowances of $25,752.49 for a total expense reimbursement award of $36,-672.57.

### 2

### *Guy, Mentzer & Towne*

■ GM & T was appointed as counsel for the creditors' committee of MTR on November 5, 1979. Perhaps the principal contribution of the firm to the size of the estate ultimately realized was its lead role in challenging, through extensive negotiations, litigation and commencement of appellate proceedings, the claimed security interests of Equitable and Aetna. While unsuccessful at the trial level, the committee's counsel and the trustee were able to secure a substantial discount of the claim of the secured creditors in a negotiated settlement while an appeal was pending. The trustee credits the firm's work with adding at least $2,000,000.00 to $3,000,-000.00 to the estate.

It was GM & T, acting on behalf of the committee it represented, which successfully prosecuted a motion for the appointment of a trustee in the MTR case. This was a significant step in the administration of all three cases as the trustee was able to provide sorely needed leadership in bringing about a final resolution of the myriad of problems that beset these estates.

A total of 2,758 hours is claimed by GM & T to have been invested in the firm's work on behalf of its committee, for which it seeks an award of $279,793.00. There is some indication in the supporting data filed with the fee applications of duplication of effort in the form of using, in some instances, two partners and a then-associate on certain trials and in some of the discovery activities. Also noted are charges for conferences between and among GM & T personnel with the result that each of the conferees has billed for the time spent. Accordingly, an adjustment is warranted and the court will reduce the allowed compensable hours by 10% to 2,482.

The firm's rates range from $60.00 per hour for associates to $110.00 per hour for its senior partners. These are not deemed unreasonable, particularly in more recent years for which GM & T has made no adjustment. The composite hourly rate is $101.44 per hour, which results in a final award of $251,774.08. The court has previously approved interim allowances totaling $198,139.50 and reimbursement of expenses in the amount of $2,237.86. GM & T may be paid the balance of $53,634.58 as a final award of compensation.

### 3

### *Benesch, Friedlander, Coplan & Aronoff*

■ Benesch, Friedlander's involvement in these proceedings began with the present firm's predecessor being appointed on November 7, 1979 to serve as counsel for the Penn-Miss creditors' committee. The service for which compensation is sought continued uninterrupted through the confirmation of the Second Modified Consolidated Plan of Reorganization. Two overriding issues occupied the attention of the firm: equitable subordination and substantive consolidation of the cases, both of which would have been detrimental to the interests of the unsecured creditors represented by Benesch, Friedlander. Constant attention was therefore required from personnel of Benesch, Friedlander and a total of 35 persons were involved in the case at one time or another over the years.

The previously mentioned arrangement with United Capital Corporation and the ultimate efforts by the debtors to extricate themselves from that situation involved significant work by the Benesch, Friedlander firm, including some of its tax partners. While difficult to assess in terms of its ultimate impact upon the estate available for distribution to creditors, the decision to withdraw from participation with United Capital Corporation and the efforts expended to facilitate that decision were, in the court's view from its perspective, clearly in the estate's best interests and, as such, valuable and worthy of compensation.

Finally, Benesch, Friedlander credits itself, without dissent from the trustee or anyone else, with being the "laboring oar" in the preparation of the disclosure statement ultimately approved by the court. The firm further, to the court's knowledge, collaborated heavily with the trustee on the plan which was confirmed, a plan which even though of a liquidating nature, was complex and involved matters of considerable difficulty.

The court is troubled, once again, by the frequency of multiple charges by firm personnel at their respective billing rates for conferences or "consultation." Examples are found throughout the nine separate applications for compensation presented over the life of these cases.[9] The court acknowledges the necessity for intra-office consultation on matters of difficulty which arise in the administration of any case; the ready availability of persons of expertise promptly to attack and resolve problems is an often cited justification for employing a large, diverse firm which can provide quick, effective answers to questions which arise in today's multi-faceted bankruptcy problems. The practice, however, can be abusive. When two, three, four or more individuals sit down to confront a problem, the result is, mildly put, expensive to the estate. For instance, a June 14, 1985 conference among four Benesch, Friedlander lawyers, at least two of whom were partners, produced four hours of charges for what appears to be a maximum of 1.25 hours of actual meeting time. Moreover, one of the conferees charged 2.5 hours for preparing for that same meeting. At the rates billed by those participating, that 1.25 hour meeting cost the estate $681.25.

This is by no means an isolated instance. On March 11, 1985, six of Benesch, Friedlander's personnel charged 15.75 hours of time in conferences, phone consultations and reviews. At the rates then in effect for the participants, that day cost the estate $1,819.00. Again, on March 22, 1985,

three Benesch, Friedlander lawyers conferred in New York with representatives of the United Capital Corporation. Two of the conferees on behalf of the estate recorded 12 hours each for their time spent while the third entered 13.75 hours. Multiplying these charges by the rates reported for these persons produces a charge of $3,648.75 against the estate for that day's efforts. Additionally, several hours were charged on the day before in preparation for that meeting and more time was expended the day following the meeting to review its results.

Finally, charges are noted for preparation of fee applications, preparation for appearances at hearings in support thereof, participation in those hearings and preparation of orders reflecting the court's determinations in regard thereto. Such matters, as noted above, are not deemed compensable by the court.

The court concludes that a reduction in the number of hours allowable to the Benesch, Friedlander firm is appropriate and accordingly deducts 15% from the 3,716.25 hours documented by the applicant. The resulting 3,159 allowable hours is then to be multiplied by a reasonable hourly rate. The court notes that between the first application for interim compensation and the ninth or final one before it, Benesch, Friedlander's composite or blended rate has dropped slightly, despite significant rate increases for various partners over the years. The explanation, of course, lies in the greater, and generally commendable, use of lower paid personnel rather than partners to perform work of a more routine nature. The composite rate so calculated of $111.91 per hour is somewhat higher than that asserted by the other law firm applicants herein. While no challenge was made to Benesch, Friedlander's claim that its rates are consistent with those of firms of comparable size and experience in the Cleveland, Ohio area, the court is of the

9. Benesch, Friedlander made no comprehensive application for compensation at the filing of its final request, referring the court to previous applications and its "narrative amplification

and explanation of all matters herein pertinent at the hearing which may be held to consider this Application ..."

opinion that some adjustment is possible and appropriate in view of the results attained. The court fixes a composite rate of $107.50 per hour as reasonable for Benesch, Friedlander, which, when multiplied by the number of hours allowed as noted above, produces a final award of $339,592.50 to Benesch, Friedlander as and for compensation for its services on behalf of the Penn-Miss creditors' committee.

Heretofore, by way of interim compensation awards as permitted under 11 U.S.C. § 331, the court has allowed full reimbursement of expenses to Benesch, Friedlander, except for $1,239.00 in certain air fares included in the firm's eighth application for interim compensation and reimbursement of expenses. The court now being satisfied as to the reasons for and the propriety of those expenditures, allows their reimbursement and further allows the $1,665.46 sought with the current application. The court has previously authorized payment to Benesch, Friedlander of $334,083.50 as compensation under its interim applications. The difference between that sum and the compensation award herein granted of $339,592.50 or $5,509.00 may be paid by the Disposition Assets Trustees forthwith, along with the expense reimbursement approved above.

### 4

### Ernst & Whinney

The firm of Ernst & Whinney was appointed as accountant for the debtors in possession in all three cases on October 19, 1979 and served in that capacity until April 29, 1983. Also, upon appointment of the trustee in the MTR case, Ernst & Whinney was authorized to act as accountant on his behalf, as well.

By order entered April 29, 1983, Ernst & Whinney was permitted to withdraw from the case, thus necessitating the employment of a successor accounting firm. The withdrawal was voluntary and was based upon a decision reached internally by Ernst & Whinney.

While active, the firm amassed charges totaling $317,494.00 for its services and expenses, of which it was paid, by way of interim compensation awards, $243,674.00. The balance of $73,820.00 remains unpaid.

Obviously, the successor had to spend time and effort to familiarize itself with the cases and the work done to date. A substantial portion of each of the initial fee applications by Coopers & Lybrand, the successor accountant in each of the three cases, is devoted to review work, although precision in this regard is impossible as specific dates and charges are not shown on those requests. The Coopers & Lybrand initial requests total $10,067.00 for the three cases, at least 60% of which, or $6,000.00, is deemed by the court to be attributable to "catching up" to Ernst & Whinney's stage of familiarity with the cases. The estate should not have to bear this expense which is directly attributable to Ernst & Whinney's unilateral decision to withdraw.

■ No objections having been raised concerning the value of Ernst & Whinney's work, its importance to the estates and the reasonableness of the charges, Ernst & Whinney will be allowed total compensation and reimbursement of expenses of $311,494.00. The difference between that amount and payments heretofore authorized, or $67,820.00, may be paid forthwith by the Disposition Assets Trustees.

### 5

### Krugliak, Wilkins, Griffiths & Dougherty

Shortly after his appointment as trustee for MTR, Samuel Krugliak sought and obtained the retention of the Canton, Ohio law firm of which he is the senior partner to serve as his counsel. Since its appointment on September 3, 1981, the firm has filed applications for compensation which total, by the court's reckoning, $283,333.53. This includes $44,375.00 as set forth in a supplemental application which seeks recovery for legal services provided by Mr. Krugliak between December 2, 1985 and

May 9, 1986 in addition to his services as trustee. Mr. Krugliak's professional legal services are charged at the rate of $125.00 per hour for 355 hours. Finally, request is made for the reimbursement of $815.99 in expenses incurred by the firm.[10] The hours the applicant firm claims to have expended in the rendering of its services, including those noted in the supplemental application, total 3,285.09.

The court has examined the computer generated data supporting Krugliak, Wilkins' requests and finds that while there are some instances of multiple charges for several attorneys conferring on problems, the frequency of such activities is far less pronounced than in the case of the other major attorney participants in these proceedings. Neither has the court found evidence of charges being entered for preparing and prosecuting applications for compensation.

Overall, the work of Krugliak, Wilkins has, in the court's view, been of significant benefit to the ultimate realization to creditors of these estates. Mr. Krugliak's role as trustee in the MTR case was catalytic in nature and provided focus and direction in an administration that had foundered with the loss, through death and resignations, of key company personnel and, to some extent, because of lessened cooperation between counsel for the debtors in possession and creditor bodies. With Mr. Krugliak came his law firm and his stewardship was certainly enhanced by the firm's assistance with his role. It is appropriate that we examine at this point the Supplemental Final Application for Allowance of Compensation of Krugliak, Wilkins presented at the hearing on the firm's original application.

The court understands the thrust of the Supplemental Application to be that inasmuch as Mr. Krugliak provided legal services and advice along with his activities as trustee, his 355 hours of time catalogued during the period mentioned should be added to his law firm's recovery.

There is no doubt in the court's mind that from the date of his appointment, Mr. Krugliak has used his recognized legal skills and experience in the dispatch of his duties. (Indeed, had such doubt existed, the court would not have selected him as trustee nor retained him in that role for nearly five years nor confirmed his appointment as a co-trustee under the plan of arrangement!)

Yet it is extraordinarily difficult, if not impossible, to separate the roles of trustee and attorney in the situation into which Mr. Krugliak was thrust. A sampling of his 48 separate days of charges on the Supplemental Application is illustrative of that difficulty: Conferences with shareholders, creditors and former employees; pre-trial conference with the bankruptcy judge; extended conferences with Mr. Simiele, one of his partners; attendance of court hearings; conferences with his bonding agent. These and numerous similar entries make up the Supplemental Application.

However difficult the task, the Code, in Section 328, quoted at pages 10 & 11 *supra*, mandates that the court may allow compensation to an attorney serving as a trustee "only to the extent that the trustee performed services as an attorney ... and not for performance of any of the trustee's duties that are generally performed by a trustee without the assistance of an attorney ..." The court's task, then, is clear; the evidence before it, unfortunately, is

10. Krugliak, Wilkins' twelfth and final application asserts a total of $234,991.25 as due it for its services. This essentially matches the court's calculation of the total of the individual applications submitted by the firm, except for $3,966.12 which Krugliak, Wilkins omits from its tenth interim application in its tabulation of the compensation it has requested to date. The court has previously withheld certain sums in making its award of interim compensation. Krugliak, Wilkins in its final application *adds* the amounts withheld to the total of its component applications which is improper. The court's approach, simply put, is to add the total compensation applied for in twelve separate applications ($238,958.53) and the supplemental application ($44,375.00) and view the total ($283,333.53) as that which will be adjusted as the court deems appropriate.

not. In the sampling above, which hat was Mr. Krugliak wearing and when?

█ The court can apply no more precise formula than to assume that Mr. Krugliak's roles were equally divided during the period in question and therefore, one half of the hours billed in the Supplemental Application will be allowed for Mr. Krugliak's services as an attorney.

█ The law firm's total number of hours billed, exclusive of those detailed in the Supplemental Application, is 2,930.09. The duplicative efforts noted are relatively minor, but cannot, if we are to be consistent, be ignored and the court will impose a modest 5% reduction in the number of hours it will allow as compensable. Therefore, compensation may be awarded on the basic application for 2,783.59 hours.

As no doubt reflective of the lesser cost of doing business in the Canton, Ohio area, the average or composite rate asserted by Krugliak, Wilkins is significantly below that charged by other major applicants in these cases and works out to $81.55 per hour. At the composite rate thus asserted, Krugliak, Wilkins is entitled, for the number of hours deemed compensable by the court, to $227,001.40. To this may be added the $22,187.50 produced by the allowance of one half of the hours charged by Mr. Krugliak, or 177.5 at his rate of $125.00 per hour. The total award then, to Krugliak, Wilkins is $249,188.90.

Previous awards under Section 331 have totaled, according to the court's records, $201,728.92. The difference, or $47,459.98, may be paid by the Disposition Assets Trustees as a final award of compensation to Krugliak, Wilkins, along with reimbursement of expenses not heretofore ordered paid of $815.99.

## 6

### Coopers & Lybrand

As previously discussed, Ernst & Whinney withdrew as accountants for the trustee and debtors in possession and, on April 29, 1983, Coopers & Lybrand was appointed to serve in that capacity. The account-

ing firm acted, in the views of those commenting upon its services and, in the opinion of the court, in a responsible, professional manner that was most helpful in bringing the numerous and complicated matters involved in these proceedings to a close.

Unfortunately, the data submitted in support of Coopers & Lybrand's application is not easily analyzed as to specific services rendered and the professional level of the personnel involved (partner, manager, senior, administrative). Following a general description of the work performed (e.g., "Review of disclosure statement pursuant to section 1125 of the Bankruptcy Code"; "Discussions with general counsel relating to tax treatment of United Capital Transactions"; "Reviewed proposed reorganization plan for impact on October 31, 1984 financial statements to be included in disclosure statement") are the cumulative hours allegedly spent ("In order for the petitioner to render the aforementioned services, it was necessary to expend approximately 23.25 working hours.") Those hours are then distributed in tabular form between unidentified personnel whose rates range from $35.00 per hour to $200.00 per hour.

█ The court is unable, from the information before it, to challenge the propriety of the total of 1,433.75 hours the applicant claims to have spent in the execution of its duties. It will allow the number of hours claimed but reduce the average hourly rate from the $118.36 sought to a number more in keeping with that allowed to other professionals in the case, to wit, $105.00 per hour. In sum, then, Coopers & Lybrand will be awarded $150,543.75 in compensation for its services, previous expense reimbursement allowances are ratified and the $8.00 sought in that regard under the final application is approved. According to the court's records, Coopers & Lybrand has to date been awarded $133,124.00 in interim compensation and the balance of $17,419.75 may be paid forthwith by the Disposition Assets Trustees.

### 7
### *Mauriello, Franklin & Company*

▉ Mauriello, Franklin & Company (MF & C) was, by order of the court entered December 28, 1979, employed as accountants for the Penn-Miss creditors' committee and thereafter performed services for the benefit of that creditor body, the thrust of which was to defend against any effort to consolidate the Penn-Miss case with that of MTR.

The bulk of MF & C's services was performed between December 31, 1979 and August 31, 1981, for which the court allowed the entirety of $21,680.00 sought as compensation and reimbursement of expenses of $2,004.55 on an interim application filed pursuant to Section 331. MF & C seeks, as final compensation, $4,740.00 for 39.5 hours spent in consultations with committee members and counsel. These services were performed by Dr. Joseph Mauriello, the senior partner of his nine member firm. Dr. Mauriello holds a Ph.D. degree from New York University where he taught for 35 years before moving to his present teaching position in the graduate school at Seton Hall University. He continues to combine an academic career with that of a practicing accountant and business advisor.

Again, no objection was raised to MF & C's application and, indeed, it is strongly supported by counsel for the Penn-Miss creditors' committee. The court has no reason to doubt assertions made that the applicant's work was important in achieving the solution finally reached in these cases. The application will be granted in full and the Disposition Assets Trustees may cause to be paid to MF & C the $4,740.00 sought in its final application, along with $825.00 in reimbursement of its expenses. Ratified, of course, are the previous awards made on MF & C's interim application.

### 8
### *Day, Ketterer, Raley, Wright & Rybolt*

▉ Day, Ketterer was employed by the MTR trustee and the debtor in posses-

sion Penn-Ohio to collect certain outstanding accounts receivable. The firm's efforts resulted in the realization by the estate of $171,300.00. Sought by way of compensation is $24,461.25 and $1,348.01 in reimbursement of expenses. The requested compensation amounts to approximately 14% of recoveries on the accounts receivable. The highest rate charged by firm personnel is $65.00 per hour. If the market place, i.e., hourly rates charged by similarly qualified professionals, generously discounted for less complicated work, is an appropriate guide to the court in allowing compensation, it should leap to approve this request. It does. As no award is sought beyond that previously withheld on interim applications, the Disposition Assets Trustees may forthwith pay over the sum of $5,461.25 to Day, Ketterer.

### 9
### *Samuel Krugliak, Trustee*

Mr. Krugliak was appointed, as previously mentioned, to serve as trustee in the MTR case on August 11, 1981. His role in bringing together forces and interests which were previously at odds with each other and providing leadership to a debtor that had lost personnel formerly in charge of its guidance has also been discussed. Indeed, the only comment received by the court came from counsel for the Penn-Miss creditors' committee, certainly at one time strongly antagonistic to the interests of MTR, who was entirely supportive.

The court is aware that the statutory formula in Section 326 fixes a maximum allowance for trustees' fees and that any award by the court is permissive in nature and may stop well short of the maximum where appropriate. Nevertheless, the court believes, based upon its observations of the administration of this case, that Mr. Krugliak has executed his duties in a highly professional and skilled fashion to the end that at least some recovery is available for creditors which, without his services, would likely have been lost to them.

Accordingly, the court grants the trustee's application in full and directs the Disposition Assets Trustees to disburse to Mr. Krugliak the difference between the sum paid to him on his interim applications, $149,630.81, and that due him by application of the formula set forth in Section 326 as that statute provided prior to its amendment in 1984. (See footnote 6 above) Given total cash disbursements of $15,204,790.41, the trustee is entitled to $152,927.90.[11] Payable at this time, then, is $3,297.09. The court ratifies its earlier award of $1,216.89 to the trustee in reimbursement of his expenses.

## 10

### Hillsinger & Costanzo

Following its appointment as an attorney for MTR as a debtor in possession on May 13, 1980, the law firm of Hillsinger & Costanzo of Los Angeles, California performed services on behalf of MTR through its defense of the debtor in various products liability actions. By its application filed February 28, 1986 and duly scheduled for hearing on June 2, 1986, the firm requested $12,892.55 in payment on invoices attached to its application. No appearance was entered at the hearing by the applicant.

The court finds that on October 1, 1985, a hearing was held at which it authorized payment to Hillsinger & Costanzo of $12,908.15 on an application filed by the trustee on behalf of that firm on August 19, 1985. An order was entered on October 10, 1985 journalizing that award. The court is presented with no information that would suggest that its October 10, 1985 award was not a final disposition of any and all claims of Hillsinger & Costanzo and there-

fore, no further payment will be authorized at this time.[12]

## 11

### Administrative Expense Claims

Five law firms have presented, through the trustee, what are denominated administrative expense claims. The firms, Hagenbaugh & Murphy of Los Angeles, California; Bassford, Heckt, Lockhart & Mullin, P.A. of Minneapolis, Minnesota; French Rogers Kezelis & Kominiarek, P.C. of Chicago, Illinois; Breit, Best, Richmand and Bosch of Denver, Colorado; and Mulholland, Minion & Roe of Williston Park, New York, assert claims for services rendered on behalf of either MTR or Penn-Ohio in litigation involving those debtors in various courts in the geographic localities of the applicant firms. Many of the services charged for were performed prior to the debtors' filing for relief under the Bankruptcy Code and therefore do not, obviously, rise to the level of administrative claims cognizable under Section 503 of the Bankruptcy Code. None of the applicants has been appointed pursuant to 11 U.S.C. § 327.

The co-trustees have objected to those portions of the claims which represent services allegedly performed prior to October 1, 1979. They recommend allowance of the post-petition portion of each of the claims.

The court does not accept that recommendation. The overwhelming weight of authority seems to be to the effect that professional services performed for a bankruptcy estate are compensable out of the assets of the estate *only* if such professional assistance has been authorized by the court prior to the services being rendered. *See, e.g., In re Morton Shoe Companies,*

---

[11]

| | | | | |
|---|---|---|---|---|
| $    0—$ 1,000 | @ 15% | = | $ | 150.00 |
| $ 1,000—$ 3,000 | @ 6% | = | | 120.00 |
| $ 3,000—$20,000 | @ 3% | = | | 510.00 |
| $20,000—$50,000 | @ 2% | = | | 600.00 |
| over $50,000 | @ 1% | | | 151,547.90 |
| | | | | $152,927.90 |

**12.** The court acknowledges receipt, on May 8, 1986, of a letter from Baker & Hostetler, trans-

mitting two statements for Hillsinger & Costanzo which had been directed to Baker & Hostetler. The statements are for $246.00 and $195.00, respectively, plus expenses. Baker & Hostetler also furnished the court with a copy of a letter sent to Hillsinger & Costanzo suggesting that it may wish to make "formal application" to the court. No such application was forthcoming and the court has no way to discern whether previous applications incorporated the charges set forth in these statements.

*Inc.*, 22 B.R. 449 (Bankr.D.Mass.1982); *In re Pollock*, 22 B.R. 673 (Bankr.D.Mass. 1982); *In re Pathway, Inc.*, 41 B.R. 400 (Bankr.D.Hawaii 1984); *In re Salopin Paints, Inc.*, 38 B.R. 807 (Bankr.S.D.N.Y. 1984); *In re Lindo's Tours USA, Inc.*, 55 B.R. 475 (Bankr.M.D.Fla.1985).

Designating such claims "administrative expenses" hardly alters the result. An allowance under Section 503 is by definition an allowance of an administrative expense and the statute specifically speaks, in para. (2) of subsection (b), of awards to professionals under Section 330(a), which, in turn, calls into play Sections 327 and 1103 in accordance with which the court's approval is necessary for the hiring of such professional services.

Courts are frequently requested to cure the failure to secure the prior approval of the employment of professionals by entering orders *nunc pro tunc* and that practice has spawned its own array of cases which generally approve of the practice. *See, e.g., Hunter Savings Association v. Baggott Law Offices Co. L.P.A.*, 34 B.R. 368 (S.D.Ohio 1983) *rev'd on other grounds* 750 F.2d 536 (6th Cir.1984); *In re Vlachos*, 61 B.R. 473 (Bankr.S.D.Ohio 1986); *In re Tinsley & Groom*, 49 B.R. 94 (Bankr.W.D. Ky.1985); *In re Four Star Music Co., Inc.*, 42 B.R. 191 (Bankr.M.D.Tenn.1985); *In re Tom's Variety & Hardware, Inc.*, 30 B.R. 298 (Bankr.S.D.Ohio 1983).

There is dissent from that approach as noted in *In re Kroeger Properties & Development, Inc.*, 57 B.R. 821 (Bankr. 9th Cir. 1986) which indicates that at least four circuits have held that no such power exists or that there is a rule against granting a *nunc pro tunc* order approving employment of professionals.[13]

■ We need not struggle with that issue for there is no motion before the court to effect such an appointment, unless the trustee's application on behalf of these claimants "for attorney's fees as an administrative expense" can be so construed. An

appointment *nunc pro tunc*, whatever else it may be and however it may be viewed, is certainly extraordinary and the court declines to find that it may occur by inference.

The claims of the law firms listed at the outset of this section and denominated "Administrative Expense Claims," for services allegedly performed since the filing of the petitions commencing these cases, will be denied in their entirety.

An order consistent with the findings and conclusions herein will be prepared and entered forthwith.

---

13. Interestingly, the Panel cites *Grochenour v. Cleveland Terminals Bldg. Co.*, 142 F.2d 991 (6th Cir.1944) *cert. denied* 323 U.S. 767, 65 S.Ct. 120, 89 L.Ed. 614 (1944) as placing this Circuit in that group. The court's reading of *Grochenour* leads it to no such conclusion.