OPINION OF THE COURT
Bernard J. Fried, J.
On March 31, 1994, the defendant pleaded guilty to the crime of misapplication of bank property, in violation of section 673 of the Banking Law, a class E felony. The defendant now awaits sentencing.
The "property” involved here was a portion of Manufacturers Hanover Trust Company’s (MHT) participation in a Deutschmark denominated debt owed by Colombia (the Colombian asset), a so-called less developed country. With regard to the defendant’s sentencing, the People have requested that I impose a fine, as well as restitution and reparation, to be paid to MHT’s successor in interest, Chemical Bank (Chemical), of the profits allegedly obtained by the defendant and his business associates by their purchase and subsequent sale of the *74 Colombian asset.[1] This latter request presents the question whether the restitution and reparation provisions of the Penal Law include the appreciated value of property held and then sold by a defendant after the commission of the crime which involved the obtaining of that property, or is such restitution and reparation limited to the value of the asset at the time it is obtained from the bank. If I determine that the statute contemplates such appreciated value, a related issue is how should it be determined: does it include the total profits realized by the defendant and his associates, or just the profits realized by the defendant; and is it necessary to determine exactly whether the bank would have realized a similar profit. For the reasons that follow, I conclude that the appreciated value is not a subject of restitution and reparation; therefore it is unnecessary to reach the related issues.
The defendant was employed at MHT as a vice-president who traded less developed country debt. While he was so employed, MHT purchased a participation in the Colombian debt referred to above, which had a face value of approximately $4 million. The defendant, who believed that this asset would substantially increase in value beyond the price at which it was purchased by the bank, used his position at MHT to influence the sale (which included an option to purchase more), on November 30, 1990, of a portion of this asset to Tritech Holdings, Inc., at 67.5% of its face value, which was higher than the bank’s original purchase price. Through further transactions, a portion of this sold asset was acquired by Y & A Holdings, Inc., of which the defendant was a 50% shareholder. (The remaining portion of the Colombian asset was held by Tritech and two other investors.) This asset then did substantially increase in value, and between August and December of 1991, Y & A and the others sold it, realizing a total profit, according to the People, of $969,732, an amount adopted by Chemical in its claim for restitution and reparation. The defendant contends that his "post-tax gain from his ownership and sale of the Colombian [asset] was something less than $125,000”.
It may be, as the People have suggested, that the sale price of 67.5% to Tritech was artificially low due to the defendant’s *75 working both sides of the transaction and, in essence, selling the asset to himself; however, loss is not an element of the crime of misapplication of bank property. In any event, the People assert that the "primary consequence of the defendant’s conduct was, of course, that [MHT] sold the Colombian asset to [Tritech] on November 30, 1990. The sale, which resulted in some profit to the bank, deprived the bank of the opportunity to reap significant additional profits from continued payments on the loan and the expected rise in market price of the asset.” It is this increase in value, calculated based upon the sale of the Colombian asset by the defendant and the other investors that forms the basis of the restitution and reparation request.
The starting point in the analysis of whether such "significant additional profits,” or the appreciated value calculated as of the date that the Colombian asset was sold, is compensable as restitution and reparation, is section 60.27 of the Penal Law, as amended in 1992 (L 1992, ch 618). Section 60.27 provides that a court can order a defendant to "make restitution of the fruits of [the] offense and reparation for the actual out-of-pocket loss caused thereby” (Penal Law § 60.27 [1]). It further provides that in ordering such restitution or reparation, there be a "finding as to the dollar amount of the fruits of the offense and the actual out-of-pocket loss to the victim caused by the offense” (Penal Law § 60.27 [2]).
The 1992 amendments, which were part of a bill enacted to respond to the Supreme Court’s invalidation of the "Son-of-Sam” law (Simon & Schuster v Members of N. Y. State Crime Victims Bd., 502 US 105, 112 S Ct 501 [1991]), were designed "to require the sentencing court to determine and fix the amount of restitution and reparation based upon the dollar amount of the fruits of the offense and the actual out-of-pocket loss to the crime victim, without respect to * * * the extent to which [the defendant] profited by the offense.” (See, Mem of Governor’s Program Bill & Attorney-General’s Legislative Program, at 3, Bill Jacket, L 1992, ch 618 [emphasis supplied].) Also included in the 1992 legislation was an amendment to section 632-a of the Executive Law, creating a cause of action for a crime victim to recover "any profits of the crime” (Executive Law § 632-a [3]), defined as "any property obtained by or income generated from the sale, conversion or exchange of proceed of a crime, including any gain realized by such sale, conversion or exchange” (Executive Law § 632-a [1] [b] [ii]). According to its Senate sponsor, the amendment did *76 "not abrogate, limit or restrict in any way a victim’s right to recover * * * economic loss * * * compensable under tort law.” (Letter from Emanuel R. Gold, Deputy Minority Leader, dated July 23, 1992, Bill Jacket, L 1992, ch 618.)
This amendment eliminated from subdivision (2) language which directed that the sentencing court, when requiring restitution or reparation, "make a finding as to the fruits of the offense or the loss or damage caused by the offense.” In its place, it substituted a direction that the court "make a finding as to the dollar amount of the fruits of the offense and the actual out-of-pocket loss to the victim caused by the offense.” The amendment, however, did not delete from subdivision (1) a requirement that the "district attorney * * * advise the court at the time of sentencing that the victim seeks restitution, the extent of injury or economic loss or damage of the victim, and the amount of restitution sought by the victim.” Notwithstanding that this latter language still remains, it appears, as McKinney’s Practice Commentaries puts it, that "in light of the current amendments,” which also substituted the "out-of-pocket” language in the probation and conditional discharge statutes (Penal Law §§ 65.05, 65.10), the term damage now "refers to the [victim’s] 'actual out-of-pocket’ loss.” (See, Donnino, Supp Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law § 60.27, 1994 Pocket Part, at 43.) This reading is confirmed by the Ten-Day Bill Report which stated that the amendment was to "clarify that the order of restitution and reparation will be for the victim’s actual out-of-pocket loss” (Ten-Day Bill Budget Report on Bills, dated July 14, 1992, at 2, Bill Jacket, L 1992, ch 618).
While courts have been authorized in this State to direct restitution since 1910 (People v Fuller, 57 NY2d 152, 157 [1982]), earlier law only permitted a sentencing court, as a condition of a suspended sentence or probation, to require the defendant "to make restitution or reparation to the aggrieved parties in an amount to be fixed by the court, not to exceed the actual losses or damages caused by his offense” (Code of Crim Pro § 483 [2]). The term "fruits of [the] offense” first appeared in 1964 in the Proposed New York Penal Law (Proposed NY Penal Law § 25.10 and Commn Staff Notes reprinted in Proposed NY Penal Law [Study Bill, 1964 Senate Int 3918, Assembly Int 5376] § 25.10, at 266), and was included in the Revised Penal Law (L 1965, ch 1030, eff Sept. 1, 1967), which provided for "restitution of the fruits of his offense or make reparation in an amount he can afford to pay, for the *77 loss or damage caused thereby” (Penal Law § 65.10 [2] [¶] [now (g)]; § 65.05 [3]). Then in 1980, original section 60.27 was added (L 1980, ch 290) to expand the availability of "restitution and reparation”, keeping the "fruits” language. However, nowhere in the Proposed New York Penal Law, the Revised Penal Law or its subsequent amendments, nor in the Commission Staff Notes or the legislative history, is the term "fruits of the offense” defined. Therefore, the word "fruits” must be viewed in the context of restitution which "means, in its ordinary sense, 'restoration of something to its rightful owner’ ” (People v White, 119 AD2d 708, 709 [2d Dept 1986]; see also, Hughey v United States, 495 US 411, 416 [1990] ["ordinary meaning of 'restitution’ is restoring someone to a position he occupied before a particular event”]). "Reparation” has been held to "differs only quantitatively. Restitution is the return of all the fruits of a crime, while reparation is the partial return of as much as the defendant can afford.” (People v White, supra, at 709.) Since "[b]oth terms clearly pertain to the return of property to its owner” (People v Purcell, 161 AD2d 812 [2d Dept 1990]), a fortiori, restitution of the fruits of the crime requires return of the property taken, or its value at the time of the taking.
Of course, the Legislature, if it chose to have done so, could have provided otherwise, and included the appreciated value of the property in the restitution and reparation statute. (Compare, 18 USC § 3663 [b] [1] [B].) Indeed, CPLR article 13-A (Proceeds of a Crime — Forfeiture) explicitly defines "[proceeds of a crime” to include the appreciation in the value of property obtained by the commission of a specified felony, and "[substituted proceeds of a crime” as the gain realized by the sale of exchange or any property so obtained. (CPLR 1310 [2], [3].) This inclusion in the civil forfeiture statute of the appreciated value of illegally obtained property but not in the restitution and reparation statute, buttresses my conclusion that such value is not included in the statutory scheme.
It is also instructive to examine article 80 of the Penal Law (Fines), which provides for the imposition of a fine not to exceed "double the amount of the defendant’s gain from the commission of the crime” (Penal Law § 80.00 [1] [b]; § 80.05 [5]). Such gain is defined as the "amount of money or the value of the property derived from the commission of the crime” minus whatever has been returned to the victim or seized by the authorities (Penal Law § 80.00 [2]). Here the Legislature has explicitly recognized the gain situation and *78 has required that the sentencing court "make a finding as to the amount of the defendant’s gain from the crime” (Penal Law § 80.00 [3]). This could have been, but was not, made a part of the restitution and reparation statute. The amount of the fine, based upon such gain from the commission of the crime, is to be determined at a hearing, at which the People have the burden of proof, by a preponderance of the evidence (CPL 400.30). At such a hearing, the issue is the defendant’s gain, a discrete question unencumbered with issues of what the victim, here MHT, would have done with the asset if it had not been misappropriated. Thus, the restitution statute uniquely focuses on making the crime victim whole, and to the extent that there has been a gain by the defendant from the commission of the crime, such gain is covered by the fine statute, subtracted from which is the "amount of money or the value of property returned to the victim” (Penal Law § 80.00 [2]), or by the criminal forfeiture statute.
To hold, as I do, that the restitution and reparation provisions of the Penal Law do not include the appreciated value of the fruits of the crime does not diminish the People’s "undisputed compelling interest in ensuring that criminals do not profit from their crimes” (Simon & Schuster v Members of N. Y. State Crime Victims Bd., supra, 502 US, at 119), a "fundamental equitable principle” in this State (Matter of Children of Bedford v Petromelis, 77 NY2d 713, 727 [1991]). As indicated, not only is there a statutory mechanism to fine the defendant’s gain and for the District Attorney to seek civil forfeiture of the defendant’s profits from the crime (and such a forfeiture action is currently pending in the Civil Term of this court), but the victim has its own remedies available, e.g., an action pursuant to section 632-a (3) of the Executive Law or other traditional civil action. Clearly, these forfeiture and fine provisions vindicate the public policy of preventing a defendant from benefiting from the commission of a crime. They provide the means to strip the defendant of any unlawful gain, while restoring to the victim what was actually taken, together with any actual out-of-pocket expenses. To interpret the current restitution and reparation statutes otherwise, unless there is a determination exactly what the victim would have done with the property, a determination which the People contend would be inappropriate, would give the victim compensation which it might never have received. I do not believe that this is what was contemplated by the Penal Law provisions.
*79 Concerning the outside attorney fees expended by Chemical in connection with these criminal proceedings, I am satisfied that such fees reflect "actual out-of-pocket loss to the victim caused by the offense” (Penal Law § 60.27 [2]), since absent the commission of this crime by the defendant there would not have been such expense. However, while the dollar amount of the fruits of the offense and the actual out-of-pocket loss to the crime victim are determined without respect to the defendant’s ability to pay, the Penal Law requires that any order of reparation be "in an amount [the defendant] can afford to pay” (Penal Law § 65.10 [2] [g]). Thus, I now address the issue of the defendant’s ability to pay such reparation.
A hearing was held and extensive papers were filed on this subject.[2] By his own admission $49,986 of the $237,040 in Y & A’s cash account, which was frozen by the District Attorney in June 1993, belongs to the defendant. In addition, the defendant concedes that he is entitled to the $10,000 put up as security for his bail. This leaves him with, at the very least, current assets of $59,986, which, when combined with his ability, based on his investment training and experience, to earn money over the course of his period of conditional discharge or probation, affords him the ability to pay, as reparation, the whole of Chemical’s out-of-pocket expenses.
Additionally, however, while the People concede that a precise assessment of the defendant’s current economic circumstances cannot be made due to the fact that he has conducted his affairs "in such a way as to obscure the true nature of [his] holdings,” they contend that the available evidence indicates that the defendant’s current assets are, in fact, much greater than $59,986. In this regard, the People have identified five principal assets in which the defendant has or has recently had an interest.
First, there is Y & A’s cash account. While the defendant claims that only $49,986 of this money is his, the People contend that a more realistic assessment of the defendant’s actual share of this account is $170,910. The People arrive at this figure, in my view correctly, by making three major *80 adjustments to the account balance claimed by the defendant, including: (1) a reduction of $27,490 to cover the cost of an investment in Peruvian debt that the People conclude was made by the defendant (see, infra); (2) an increase of $124,050 to negate the defendant’s claimed investment in an Ecuadorian tree farm, which the People suggest was not made (and, in any event, even if such investment was made, it is unaccounted for in the defendant’s own asset calculation); and (3) an increase of $24,360 to negate a loss the defendant claims he suffered after, he claims, he purchased his father’s interest in a piece of Polish debt, the debt having plummeted in value only days after the claimed purchase.
Second, another Y & A account contains a piece of Peruvian debt, which was purchased in September 1991 for $54,974 and is now worth approximately $250,000. The defendant claims to have no interest in this investment. However, as the People assert, by way of strong circumstantial evidence, the defendant owns half of this debt, and his recognized assets should include an additional $125,000.
Third, in January 1992, the defendant invested $100,000 in a brokerage account which was also invested in by, and opened in the name of, another individual. The account was substantially liquidated in February 1994 and the assets eventually transferred to a Swiss account in June 1994. The defendant claims not to have been invested in the account in February 1994. However, as the People point out, there is no reliable contemporaneous record to establish that the defendant divested himself of his interest in the account prior to this date. Therefore, I have determined that the defendant was, in all likelihood, still invested in the account in February 1994, in which case his share of the payment from the account would have been approximately $150,000.
Fourth, the People contend that, were the defendant to pay restitution and reparation to Chemical Bank as part of his sentence, he would be entitled to a loss deduction on his taxes which would lead to a tax recovery of approximately $65,000. However, restitution or reparation may not be imposed based on the defendant’s gains from his investment in the Colombian asset; but rather, based on the victim’s actual out-of-pocket loss. Thus, he will not be entitled to receive any such tax recovery.
Fifth, the People contend that the defendant is entitled to a $10,000 bail recovery, which the defendant concedes, albeit *81 while claiming to have assigned this money to his attorney for payment of fees. I am satisfied that this money may be properly treated as an asset of the defendant.
Accordingly, I believe that the defendant’s assets are in the neighborhood of $460,910, and that his prospects for future earnings, even considering the instant conviction, are significant. Of course, this conclusion is only made to support my view that these assets, taken together with what the defendant can reasonably be expected to earn in the future, should provide him with the ability to pay any restitution and reparation that may be properly imposed as a term of his sentence. This conclusion should not be construed beyond this limited purpose.
I now turn to issues regarding the imposition of a fine in this case. First, it must be noted that the determination of the amount of a fine, unlike restitution and reparation, is not based upon the defendant’s "ability to pay,” i.e., the fine statute does not require, at the time the fine is imposed, a finding regarding the defendant’s ability to pay.[3] (Cf., CPL 420.10 [5].)
Nevertheless, Penal Law § 80.00 (1) (b) provides for the imposition of a fine in a felony case, which is not to exceed the greater of $5,000 or twice "the defendant’s gain from the commission of the crime.” "Gain” is defined in Penal Law § 80.00 (2) as the amount of money the defendant "derived from the commission of the crime.”
Accordingly, I calculate the defendant’s gain from the commission of his crime as follows. As noted, Y & A was a New York Subchapter S Corporation formed by the defendant (who was a 50% shareholder), the defendant’s father and two other investors in March of 1991, for the purpose of investing in the debt of lesser developed countries. Y & A initially invested $830,000 in its portion of the Colombian asset, of which the defendant contributed $195,000. In addition, a $100,000 portion of the $500,000 contribution of one of the other investors was actually a loan to the defendant. Thus, $295,000 of the initial $830,000 invested in the asset by Y & A was attributable to the defendant.
Based on the books and bank accounts of Tritech and *82 Y & A, I conclude that Y & A’s profit on the sale of the asset was $456,712. And it is, I believe, a valid assumption, based on the evidence before me, to assume that the Y & A investors shared this profit in the same proportion as their original investments. Therefore, initially, I find the profit realized by the defendant, based on his investment of $295,000 out of a total $830,000, to be $162,325. The People also contend that an additional $39,000 is attributable to the defendant as gain —$45,000 for a consulting or finder’s fee received by the defendant, less $6,000 of interest presumably paid on the $100,000 he borrowed to invest in the Colombian asset. However, since $20,000 of the $45,000 appears to have been payment for work the defendant performed during the summer of 1991, on the evidence before me, this amount cannot be said to have been derived from the commission of the crime and must be excluded from the gain calculation. On the other hand, the presumed $6,000 interest expense incurred by the defendant in relation to his investment in the asset is not a legitimate business expense and it does not reduce the defendant’s gain. (See, People v Gross, 51 AD2d 191 [4th Dept 1976].) Thus, the defendant realized an additional $25,000 in gain from his commission of the crime. Accordingly, I find his total gain to be $187,325.
Sentencing of the defendant will be as scheduled, at 10:00 a.m., Thursday, August 25, 1995. This opinion will be used by me in fashioning an appropriate sentence.

. Chemical Bank also seeks reimbursement for outside attorney fees directly incurred in connection with this criminal prosecution, when litigation ensued over subpoenas issued by the defendant for voluminous bank records. It was stipulated that these fees amounted to $116,720, although it was not conceded that these fees were recompensable.

. While most of the argument has been focused on a calculation of the defendant’s current assets, it must be remembered that the precise issue to be determined here is the defendant’s future "ability to pay” over the period of his probation or conditional discharge, of which the defendant’s current assets are only one indication; his ability to make money in the future being another.

. The portion of Penal Law § 80.00 (1) (c) that requires a court to consider the "defendant’s economic circumstances, including [his] ability to pay,” by its terms, applies only to paragraph (c) of subdivision (1) of that section, which is not at issue here.