In re EWI, Inc., Debtor.

Bankruptcy No. 96–61065.

United States Bankruptcy Court,
N.D. Ohio.

May 8, 1997.

886

William J. Rochelle, Fulbright & Jaworski, L.L.P., New York City, for Schroder Wertheim & Co.

James D. Newell, Klett, Lieber, Rooney & Schorling, Pittsburgh, PA, for Unsecured Creditors' Committee.

Joseph J. Bellinger, Miles & Stockbridge, Baltimore, MD, for Secured Lenders.

Derrick Rippy, Office of U.S. Trustee, Cleveland, OH, trustee.

Harry W. Greenfield, Buckley, King & Bluso, Cleveland, OH, for debtor.

## MEMORANDUM OF DECISION

JAMES H. WILLIAMS, Chief Judge.

Before the court are the applications of Schroder Wertheim & Co. for final compensation and the retention by Schroder Wertheim & Co. of Fulbright & Jaworski as its counsel *nunc pro tunc.* The applications came on for hearing following which the court took the matters under advisement and the parties filed post-hearing briefs.

## *BACKGROUND*

### *Retention of Schroder Wertheim & Co.*

On April 30, 1996, the debtor filed an application to retain Schroder Wertheim & Co. (Schroder) as financial advisor (Retention Application). The debtor sought to retain Schroder to assist in the marketing and sale of its South Bend and Prototype business divisions. The Retention Application states in pertinent part "[t]he services of [Schroder] are necessary to pursue a sale or other disposition of the [Prototype assets] for the greatest return for the estate and its creditors" and that "no other professional being retained in this case is capable of providing the critical services that will be performed by" Schroder. Attached to the Retention Application was an engagement letter stating the terms of Schroder's retention (the Engagement Letter).

On June 6, 1996, this court entered an order authorizing the retention of Schroder. The order expressly states on page three, "upon appropriate fee applications submitted pursuant to the Bankruptcy Code, the Bankruptcy Rules and any order entered by this Court pertaining to the payment of professional fees in this case, compensation and reimbursement of expenses of Schroder Wertheim shall be paid as set forth in the Application and Engagement Letter."

### *The Prototype Sale*

On August 14, 1996, the debtor filed a motion captioned "Motion for (1) Approval of Sale of Prototype Assets Subject to Higher

and Better Offers Free and Clear of Claims, Liens and Interests Pursuant to § 363 of the Bankruptcy Code; and (2) Approval of the Assumption and Assignment of Certain Prototype Unexpired Leases and Executory Contracts Pursuant to § 365 of the Bankruptcy Code" (the Sale Motion).

On August 20, 1996, the court held a hearing on the debtor's request to shorten notice on the Sale Motion hearing. The court granted the request and the hearing was set for August 27, 1996. The sale process for the Prototype assets contemplated the use of a "stalking horse" bidder.

A stalking horse bidder submits an early bid and absorbs the initial costs and consequences of bidding. When the contract for sale with the stalking horse bidder is filed, and the terms of the contract are disclosed to all interested parties, it is anticipated that this initial bid will elicit higher and better offers. If the estate later accepts a higher bid from another party, a breakup fee is customarily paid to the stalking horse to compensate it for the expenses incurred. *See, In re Integrated Resources, Inc.,* 147 B.R. 650, 661 (S.D.N.Y.1992).

At the August 27, 1996 hearing, the party assuming the role of the stalking horse was ProtoForm, Inc., an affiliate of the Oxford Group (Oxford). Oxford entered into a contract to purchase Prototype in the amount of $8,325,000. At the close of the bidding, several parties, including the Unsecured Creditors' Committee, objected to the sale and argued that prospective bidders did not have an opportunity to form a competitive bid due to the shortened notice and the lack of information about the sale. The court declined to approve the sale and postponed it, so that it could be more broadly noticed and marketed.

Another hearing to consider the sale of Prototype was conducted, upon due notice, on September 10, 1996. Oakley Industries submitted the highest and best offer for Prototype in the amount of $9,600,000. Oxford,

the stalking horse, was paid a breakup fee of $300,000.

### Schroder's Fee Application

On September 30, 1996, Schroder filed its fee application (the Fee Application). It sought total compensation of $700,000 ($400,000 for the sale of South Bend, to which no objection was filed and payment was duly made, and $300,000 for the sale of Prototype) and reimbursement of expenses of $59,404.34, comprised of $44,991.28 in legal fees [1] and $14,413.06 in costs incurred by Schroder during the engagement. The request for expenses included estimated amounts for the preparation and attendance at the December 23, 1996 fee hearing.

NationsBank, NA, as agent for itself, LaSalle National Bank and NBD Bank (collectively, the Secured Lenders) and the Unsecured Creditors' Committee (Committee) objected to the Fee Application as it related to Schroder's services for the Prototype sale.

A hearing was held on the Fee Application on October 29, 1996 and on November 7, 1996 the court entered an order continuing the hearing on the Fee Application, as it related to the request for fees for the sale of the Prototype division and the request for reimbursement of all expenses.

### The Application to Retain Fulbright & Jaworski

On November 13, 1996 Schroder filed an application to employ the law firm of Fulbright & Jaworski L.L.P. (Fulbright) as counsel, *nunc pro tunc,* effective as of the petition date, April 30, 1996. (Fulbright Application). Objections to the Fulbright Application were filed by the Secured Lenders, the Internal Revenue Service (IRS), the Committee and the U.S. Trustee (UST) and a hearing on the requested Prototype fees and reimbursement of all expenses, as well as the Fulbright Application, was conducted on December 23, 1996. The parties agreed to file post-hearing closing arguments.

---

1. In reviewing the amounts requested, the court has discovered that total legal fees were understated by $500.00. The numbers above reflect the correct amounts as calculated by the court.

The court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b) and General Order No. 84 entered in this district dated July 16, 1984. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A)

Based upon the papers filed, presentations of counsel at the December 23, 1996 hearing and the evidence submitted, the court makes the following findings of fact.

### *FINDINGS OF FACT*

1. Theodore L. Cook, a managing director of Schroder, testified that the $300,000 fee for the sale of Prototype was approximately 50% of its customary minimum fee for a similar transaction. Schroder charged a reduced rate of $700,000 for the sale of both divisions because Schroder was anxious to develop a business relationship with Heller Investments, the entity in control of the debtor at the time of the engagement. Although Schroder agreed to a lower fee, the Engagement Letter also provided that Schroder, under certain circumstances, would receive a 6% fee of the sale proceeds for Prototype in excess of $15 million.

2. Cook testified that by July, 1996, Schroder was aware that Heller Investments was no longer involved with the debtor or this case.

3. Schroder has considerable experience in selling industrial manufacturing businesses and has a dozen investment bankers that focus primarily on such projects.

4. David Becker, an associate at Schroder, testified that he worked for Cook on both the South Bend and Prototype sales, and though Cook was in charge of the sales, Becker was involved on a day to day basis with them and spent more time on the project than any other employee at Schroder.

5. Schroder prepared approximately 50 "offering memoranda" for the Prototype sale. These documents are generally prepared with assistance from the client. In this case, however, the debtor's records were inaccurate and not prepared in accordance with Generally Accepted Accounting Principles (GAAP). Additionally, the debtor's management was new and did not have a thorough knowledge of the company. Thus, Schroder received little assistance from the debtor in preparation of the offering memoranda.

6. When the financial data was restated to comply with GAAP the value of Prototype decreased significantly from the original valuation.

7. In early June 1996, Schroder sent the offering memoranda to approximately 30 parties who had expressed interest in the sale.

8. A list of interested parties was compiled from names received from the debtor. Additionally, some parties were suggested by Price Waterhouse, advisor to the Committee and Jay Alix & Associates, Management Consultants to the debtor, and other interested parties were identified by Schroder internally.

9. Later, the list of 30 interested parties narrowed to nine and Schroder contacted these nine parties by telephone on a daily basis.

10. Becker testified that the debtor and its advisors did not want Oakley Industries (Oakley) to be the stalking horse because Oakley was a direct competitor. The debtor believed Oakley's participation as a stalking horse would provide it with valuable information detrimental to the operation of Prototype.

11. Schroder arranged for eight to ten tours of the Prototype plant by potential purchasers.

12. After Oxford was identified as the stalking horse and a contract was filed with the court, Schroder continued to work with other interested potential purchasers. Schroder helped to negotiate the contract between the debtor and Oxford and also contacted between eight and ten parties regarding the court hearing and terms of the Oxford contract.

13. Becker estimates that he made 140 phone calls regarding the Prototype sale to

prospective purchasers from July 9 through the end of August 1996. Becker testified that he also received a substantial amount of incoming calls regarding the sale.

14. Becker further testified that Schroder was never asked to serve written notice of the sale hearing on any party.

15. On cross-examination Becker testified that his involvement with the South Bend and Prototype sales was his first experience with selling a company in a bankruptcy auction.

16. Roxanne Beer, an associate at Schroder who was assisting Becker, left the employment of Schroder in July 1996, a critical time in the Prototype sale.

17. On August 14, 1996, Richard K. Stovall, counsel for the debtor, sent a letter to Peter C. Lowry of Schroder who filled in for Becker when Becker was not in the office. The letter enclosed the executed purchase agreement between Oxford and the debtor and stated, "Once you receive these materials, please contact me so we may arrange an appropriate dissemination to other interested parties in Prototype."

18. Schroder had a list entitled "Prototype Contact List August 13, 1996" (Contact List) which contained the names of parties interested in purchasing Prototype. When Schroder received the purchase agreement by letter from Mr. Stovall it did not immediately send copies of it to the parties on the Contact List.

19. On August 20, 1996 the court shortened the notice period for the hearing for the Prototype sale and set the actual auction date and hearing for August 27, 1996.

20. During the week prior to the Prototype sale, August 19 through August 25, 1996, Becker was on vacation and did not have the files with him regarding the Prototype sale, nor did he have the Contact List.

21. From August 20 to the time of the sale Becker did not contact all the parties on the Contact List regarding the Prototype sale. He did not contact BDI, Inc. or Oakley. Becker testified that no one requested he send the purchase agreement to the interested parties on the Contact List.

22. Cook, the senior person at Schroder responsible for the Prototype sale, provided help on the Prototype sale when Becker was out of the office on vacation the week of August 19.

23. Cook testified that, in his profession and at Schroder, business projects are always a priority, even if an employee is on vacation.

24. On August 19, 1996, Cook sent the package of information on the Prototype sale to Oakley and on August 22, 1996, he sent a similar package to River Capital. These packages were sent at the request of Oakley and River Capital.

25. During the week of August 19, 1996, Cook made, at the most, one telephone call to the parties on the Contact List. He could not remember who he called.

26. After the Sale Motion was filed with the court, at no time did Cook, or anyone else at Schroder, ask the debtor to reconsider its position not to pursue Oakley as a possible purchaser.

27. During the week prior to the August 27 sale, counsel for the Committee attempted to contact the parties on the Contact List and encourage attendance at the hearing. After the August 27 hearing was postponed to September 10, counsel for the debtor continued to make these contacts.

28. There is no evidence that Schroder made any efforts to contact interested parties after the August 27 hearing was postponed.

29. Attached to Schroder's Fee Application is a certification of conformance with the Guidelines for Compensation and Expense Reimbursement of Professionals in the Northern District of Ohio. The Fee Application is dated September 30, 1996.

There are two basic issues before the court. First, in light of the evidence, what is

the amount of fees to be allowed to Schroder for its services regarding the sale of the Prototype division? Second, should the court allow the request of Schroder for payment of its attorney fees as part of its reimbursement for its expenses?

## Issue 1

### Schroder Compensation

### Conclusions of Law

Section 330 of the Bankruptcy Code addresses compensation for professionals and states, in relevant part:

(a)(1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, an examiner, a professional person employed under section 327 or 1103–

(A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and

(B) reimbursement for actual, necessary expenses.

(2) The court may, on its own motion or on the motion of the United States Trustee, the United States Trustee for the District or Region, the trustee for the estate, or any other party in interest, award compensation that is less than the amount of compensation that is requested.

11  U.S.C. § 330(a)(1)(A) and (B).

Section 328 of the Bankruptcy Code addresses limitations on compensation of professional persons and states, in relevant part:

(a) The trustee ... with the court's approval, may employ ... a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an

hourly basis, *or on a contingent fee basis. Notwithstanding* such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11  U.S.C. § 328(a). (emphasis supplied)

"[T]he burden of proof to establish the entitlement to and reasonableness of a fee is upon the professional seeking compensation." *In the Matter of The Mansfield Tire & Rubber Company,* 65 B.R. 446, 455 (Bankr. N.D.Ohio 1986) (citations omitted)

In *Mansfield Tire* this court set out the factors it considers when reviewing an application for compensation. It recognized the need to develop a "lodestar figure" (number of hours reasonably expended multiplied by a reasonable hourly rate).[2]

In addition to developing a lodestar figure the court must consider the "quality factor": the quality of advocacy required and delivered, considering the difficulty of the issues, skills called for, time constraints and the professional's personal qualifications. The court must also consider the "result factor": the bottom line recovered for the estate and the creditors. *Id.* at 455.

The lodestar approach is inapplicable here as the Engagement Letter provides for a fixed fee of $300,000 for the sale of Prototype, and financial advisors, in general, do not keep itemized time records of the services they perform. However, the court will consider the quality and result factors in reaching its conclusions as to reasonable compensation for Schroder.

Schroder submits that it is entitled to its requested $300,000 fee because it per-

---

**2.** The Sixth Circuit has approved the lodestar method as the standard to be applied for allow-    ance of professional fees. *In re Boddy,* 950 F.2d 334 (6th Cir.1991).

formed substantial services, under time constraints and difficult circumstances; its efforts resulted in obtaining Oxford as the stalking horse; and a successful sale occurred. Schroder contends it is entitled to the $300,000 on a contractual basis because the Engagement Letter provides that upon the closing of the sale Schroder "shall be paid." Schroder also argues that the $300,000 fee is below the customary fee charged in similar situations.

The objecting parties argue that Schroder's fee should be denied or substantially reduced because Schroder failed to perform its fiduciary duties to the estate after the Sale Motion was filed. They argue that after Oxford was identified as the stalking horse, Schroder failed to pursue other interested parties as potential purchasers during the critical stage of the bidding process, from August 20 through August 27.

The court finds that the fee agreement between Schroder and the debtor, as stated in the Engagement Letter, does provide for a contingent $300,000 fee upon the sale of Prototype. It is undisputed that the sale occurred and services were rendered by Schroder regarding the sale. Schroder argues that contractually it is entitled to its fee and there is no authority to deny or reduce the fee. The court disagrees.

As stated earlier, under sections 328 and 330 of the Bankruptcy Code, this court has an independent duty to examine the Fee Application and may adjust the fee award based upon the quality and result factors detailed above.

In considering the quality factors, the court finds the sale took place under time constraints and difficult circumstances in that the financial data initially available was inaccurate and unreliable, the Prototype assets were greatly overvalued, and the management staff was new and unfamiliar with the

company at the initial stages of the sale. (Finding No. 5). The evidence before the court demonstrates that Schroder did perform services to market the property and obtain a stalking horse. These services were incurred from the time of Schroder's retention to August 20, the date of the filing of the Sale Motion that identified Oxford as the stalking horse and included the preparation of the offering memoranda, its distribution to the 30 potential purchasers and the continued follow up with those parties. (Findings Nos. 5 and 7). It is undisputed that Schroder pursued interested parties through meetings, negotiations, arranging plant tours and many telephone calls until the list of interested parties was reduced to those on the Contact List. (Findings Nos. 7–9, 11–13). The evidence also establishes that Schroder was instrumental in the negotiations that resulted in Oxford becoming the stalking horse. (Finding No. 12).

However, during the time period from August 20 to August 27, and thereafter, it appears that Schroder failed to perform as the circumstances required. This time was critical to continue marketing Prototype and informing interested parties of the terms of the Oxford contract in order to encourage attendance at the sale hearing and elicit higher and better offers. Becker, the person in charge of the day to day operations on the sale, was on vacation from August 19 through August 26. (Finding No. 20).[3] Becker did not distribute the executed Oxford contract to all the parties on Schroder's own Contact List. (Finding No. 18).

Cook did send bid materials to two parties during this time period, but this was done at the parties' request. Cook also made one phone call about the sale at this time. (Finding No. 25). No one at Schroder attempted to contact Oakley, even after the stalking horse was identified. (Finding No. 26). There is no evidence that Schroder aggressively pursued other interested parties, dis-

3. The court neither expresses nor implies criticism of Becker. It respects his entitlement to a respite from what appears to be a stressful occupation. If the *employer* will seek full compensa- tion for his services during this period, however, it must assure that his duties will be fully assumed by others.

tributed bid materials or encouraged parties to attend the sale hearing after the stalking horse was identified.

The court must also consider the result factor which focuses on the amount recovered for the estate and the creditors. The initial Oxford contract was for $8.325 million and the final sale amount was $9.6 million. Schroder has proven that its efforts were responsible for obtaining Oxford as the initial bidder. However, the evidence clearly establishes that substantial efforts by parties other than Schroder, specifically, the debtor and the Committee, were responsible for obtaining the higher final sale amount. (Findings Nos. 27–28).

Upon this analysis, the court concludes that a 25% reduction in fees requested, amounting to $75,000 ($300,000 requested × 25%), is appropriate under the circumstances. Accordingly, the court will enter an order for a total allowance of $225,000 for compensation to Schroder regarding the Prototype sale.

### Issue 2

### Schroder Reimbursement

Two questions arise: Has Schroder any contractual right to reimbursement for the charges rendered by Fulbright as its counsel; and, if so, is there a basis for compensating Fulbright under the Guidelines for Compensation and Expense Reimbursement of Professionals in the Northern District of Ohio (Guidelines)?

### a.

### Schroder's Contractual Rights

### Conclusions of Law

In the Fee Application, Schroder requests reimbursement of expenses of $59,404.34, comprised of $44,991.28 in legal fees (Fn.1) and $14,413.06 in costs. Schroder argues that there are three separate grounds to allow payment of its legal fees: the Engagement Letter; the indemnification provision therein; and the "carve-out" provision for professional fees that is part of the cash collateral order.

### *The Engagement Letter*

■ The Engagement Letter states that Schroder will be reimbursed for "its reasonable out of pocket expenses"

Schroder contends that under New York law, out of pocket expenses have been understood to include legal fees and cites in support *In re Howard Beach Appeal Fund, Inc.,* 141 Misc.2d 735, 534 N.Y.S.2d 341, 342 (N.Y.Sup.Ct.1988). This court does not find *Howard Beach* persuasive. That case does not address the issue but simply states in *dicta* that funds to be distributed from a corporation shall be made for "actual out-of-pocket expenses for legal fees". Similarly, in *People v. Young,* 163 Misc.2d 72, 618 N.Y.S.2d 983, 988 (N.Y.Sup.Ct.1994) cited by Schroder, the issue is not addressed and the court simply finds that legal fees expended by a bank regarding a criminal proceeding "reflect 'actual out-of-pocket loss to the victim caused by the offense'. (Penal Law section 60.27[2] )". These cases are of little help.

Nor does the court find *Pelella v. Pelella,* 13 Misc.2d 260, 176 N.Y.S.2d 862, 867 (N.Y.Sup.Ct.1958), *aff'd* 9 A.D.2d 897, 195 N.Y.S.2d 599 (1959), cited by the objecting parties, to be persuasive on this issue. In that case, the court held that attorneys' fees are not considered "costs" awarded in litigation.

However, *Royal Discount Corp. v. Luxor Motor Sales Corp.,* 9 Misc.2d 307, 170 N.Y.S.2d 382, 383 (N.Y.Sup.Ct.App.1957) cited by the Secured Lenders, does address the issue and states "attorney's fees are not recoverable in the absence of express language in the contract or statute". In *Hayman v. Morris,* 37 N.Y.S.2d 884, 891 (N.Y.Sup.Ct. 1942) the court states "It is generally agreed that the term 'costs' or 'expenses', as employed in a statute, ordinarily does not include 'attorney fees'."

At best, the Engagement Letter may be considered ambiguous on the issue of whether "out of pocket" expenses include legal fees. Again, under New York law, interpretation of that term must be construed against

Schroder, the drafter of the Engagement Letter. *Lai Ling Cheng v. Modansky Leasing Co., Inc.,* 73 N.Y.2d 454, 541 N.Y.S.2d 742, 745, 539 N.E.2d 570, 573 (1989)

This court also finds compelling the argument of the UST that allowance of legal fees as "out of pocket" expenses by a retained professional in a bankruptcy case circumvents the requirements of section 327 of the Bankruptcy Code, Fed. R. Bankr.P. 2014 and paragraph 19 of the Guidelines. If this reasoning is adopted it would allow professionals to render services to an estate without making disclosure of their interests and connections to the debtor that may otherwise prohibit their retention.

Accordingly, this court concludes that the phrase "out of pocket expenses" as used in the Engagement Letter does not include legal fees.

### The Indemnification Agreement

■ Schroder also argues the Indemnification Agreement provides a basis to allow its legal fees. Specifically, the Indemnification Agreement provides, in pertinent part, that:

[T]he Company agrees: (I) to indemnify and hold Schroder Wertheim (which term for purposes of this letter includes its subsidiaries, affiliates, directors, controlling persons (as such term is defined under the Securities Act of 1933), officers, employees and agents) harmless against and from all losses, claims, damages or liabilities, joint or several (and all actions, claims, proceedings and investigations in respect thereof), to which Schroder Wertheim may become subject in connection with its performance of the services described in the Agreement under any of the Federal securities laws, under any other statute, at common law or otherwise; ...

and (iii) in each case to reimburse Schroder Wertheim **for all reasonable legal and other out-of-pocket expenses** (including the cost of investigation and preparation) as and when incurred by Schroder Wertheim arising out of or in connection with any action, claim, proceeding or investigation (whether initiated or conducted by the Company or any other party) in connection therewith, whether or not resulting in any liability (and whether or not Schroder Wertheim is a defendant in, or target of, any such action, claim, proceeding or investigation)

(emphasis supplied).

The language of the Indemnification Agreement is broad and specifically provides that the debtor will indemnify Schroder for reasonable legal fees in connection with the performance of its services. In this case, Schroder incurred legal fees regarding the objections to the performance of its services and its right to payment on the Prototype sale. It appears the condition for indemnification has been satisfied and, therefore, Schroder is contractually entitled to reimbursement for reasonable legal fees only for those matters. Even with the broad language in the Indemnification Agreement, the indication is clear that only legal fees related to Schroder's performance are reimbursable.

■ The Secured Lenders contend that any payment of Schroder's legal fees, if allowed, is an administrative claim under § 503(b) of the Bankruptcy Code, subordinate to the Secured Lenders' secured claim. The Secured Lenders further state that they do not consent to a § 506(c) surcharge against their collateral for payment of Schroder's legal fees. In response, Schroder argues that the cash collateral order, entered May 23, 1996, contains a specific "carve-out" provision authorizing and providing fees for financial advisors.

In pertinent part at page 12, the cash collateral order reads:

**Debtor may use the proceeds of the loans and advances made, and other financial accommodations** provided by Lenders to Debtor, to pay ... **(b) such fees and expenses of all professionals and other persons employed by Debtor and the Committee** (Estate Professional Fees) including, but not necessarily limited

to, ... **financial consultants** ... as and only to the extent such payments are approved by the Court and provided and budgeted for in the "Income Statement," corporate cost item, described as "Legal and Professional Fees" in *Exhibit C* to this Final Financing Order, except as provided below, all of which payments shall be subject to the terms of (sic) conditions of employment and compensation as approved by the Court; and provided further that Lenders' consent to the Debtor's payment of Estate Professional Fees shall be limited to the payment of no more than $2,085,000 in the aggregate ... **plus any payments to investment bankers, brokers, or other sales professionals employed to sell property of the estate** as provided for in the "Disposal Summary", disposal cost estimates, in *Exhibit C* for the period beginning on April 15, 1996 through December 31, 1996 (the Estate Professional Fees Carve–Out)

(bold text emphasis supplied).

This language leads the court to conclude that "Estate Professional Fees," capped at $2,085,000, encompasses Schroder's fees and expenses otherwise allowable. The order further provides that any payment is subject to "terms of (sic) conditions of employment and compensation as approved by the Court".

The court has found that the debtor has a contractual basis to pay Schroder for reasonable legal fees for certain services, under the Indemnification Agreement. Thus, Fulbright's fees, which are owing under the court approved Engagement Letter, of which the Indemnification Agreement is a part, appear to be included within the carve-out in the cash collateral order. Accordingly, the court finds that the terms of the cash collateral order provide authority for the payment of certain of Schroder's reasonable legal fees.

*b.*

Given Schroder's contractual right of recovery for its legal fees and expenses in connection with defending its performance of its services, the court must now determine whether its Guidelines permit payment for the services and reimbursement of expenses of Fulbright. Seemingly, they do not, for paragraph 19 of the Guidelines provides:

> A professional employed under § 327 of the Bankruptcy Code may not employ or charge as an expense services provided by another professional unless employment of the second professional is approved by the Court prior to the rendering of services.

■ In other words, the Guidelines prohibit fees for what are known as "second-tier" professionals without prior court approval. Again, as in the rationale for denying attorney fees as out of pocket expenses, the unrestrained hiring of professionals by other professionals already retained in the case would divest the court of authority to review their charges.

■ On November 13, 1996 Schroder filed the Fulbright Application to employ Fulbright as counsel, *nunc pro tunc*, effective as of the petition date, April 30, 1996. Schroder states that due to the emergency circumstances at the beginning of the case (including the urgent need to sell the debtor's two divisions), Fulbright performed the initial work regarding retention of Schroder at the request of debtor's counsel. Services were performed even before the court approved the retention of Schroder. Fulbright later assisted in preparation of the Fee Application when it appeared there would be objections thereto, prepared a written response to the objections and appeared in court for Schroder. Schroder further states that Fulbright's services were completed before there was time to obtain court permission to retain the firm. In the Fee Application Schroder requests $44,991.28 for legal fees charged by Fulbright on its behalf. (Fn.1) Of this total, $3,055.03 represents expenses incurred by Fulbright in its representation of Schroder.

The objecting parties argue that no extraordinary circumstances existed to warrant *nunc pro tunc* retention and such retention would be prejudicial to creditors.

This court addressed the issue of *nunc pro tunc* appointments in *Matter of Platinum*

*Power Co.,* 105 B.R. 381 (Bankr.N.D.Ohio 1989) and quoted, in denying the application before it, *Matter of Arkansas Company,* 798 F.2d 645, 650 (3d Cir.1986):

> To summarize, we hold the retroactive approval of a professional may be granted by the bankruptcy court in its discretion but that it should grant such approval only under extraordinary circumstances. Such circumstances do not include the mere neglect of the professional who was in a position to file a timely application.... Thereafter, in exercising its discretion, the bankruptcy court must consider whether *the particular circumstances in the case adequately excuse the failure to have sought prior approval.* This will require consideration of factors such as whether the applicant or some other person bore responsibility for applying for approval; whether the applicant was under time pressure to begin service without approval; the amount of delay after the applicant learned that initial approval had not been granted; the extent to which compensation to the applicant will prejudice innocent third parties; and other relevant factors.

105 B.R. at 384

*Nunc pro tunc* retention was approved in *In re 245 Associates, LLC,* 188 B.R. 743, 752–753 (Bankr.S.D.N.Y.1995). In that case, the court approved retention of counsel for a receiver in bankruptcy because the law related to such retention was unclear and confusing. The court also found the receiver filed the application quickly after being instructed to do so and the court found no prejudice to the debtor.

Certainly, if appointment of Fulbright is to be approved, it must be on a basis other than exigent circumstances. Such existed here, if at all, only at the outset of the case when the so-called retention services were provided and those, the court has concluded above, are not reimbursable to Schroder under its contractual arrangement with the debtor.

Schroder argues that it was not aware of the Guidelines and did make efforts to obtain the local rules of court. Counsel indicated that an associate at Fulbright consulted the Bankruptcy Local Court Rules Service, published by Callaghan & Co., for the applicable rules for this district. However, that publication does not contain a copy of the Guidelines nor does it refer to them.[4]

■ Even though the Guidelines are not in the published local rules service examined by Fulbright, Schroder's Fee Application indicates that it had a copy of them. Attached to the Fee Application, filed September 30, 1996, is a certification by Theodore Cook, Managing Director of Schroder, stating he reviewed the Fee Application and found that it complies with the Guidelines. (Finding No. 29). Thus, it appears that Schroder had the Guidelines at least some time prior to September 30, 1996 and therefore was aware of the requirement of court approval for second-tier professionals. Arguably, Fulbright, with its wide and varied national bankruptcy practice, should have been aware of the obligations under section 327 if it intended to seek compensation from the estate. "[A] professional person serving in a bankruptcy case has the 'responsibility to know that such approval is necessary and to insure that it has in fact been sought'". *In re Marion Carefree Limited Partnership,* 171 B.R. 584, 592 (Bankr.N.D.Ohio 1994).

Nevertheless, the court accepts responsibility for the lack of notoriety of its Guidelines[5] which are, possibly, unique to this district. Further, as the focus is on those services rendered in defending Schroder's performance, the delay in seeking Fulbright's appointment *nunc pro tunc* is less egregious and the harm to others is minimized; the court and the parties were put on notice of the Fulbright activities on September 30, 1996, when the Fee Application was filed and ample time was allowed, and the

---

4. The research apparently did not extend to the West Publishing Company which includes the Guidelines in its publication, "Ohio Rules of Court—Federal."

5. The court hopes that its newly renumbered local rules, effective April 7, 1997 and specifically L.B.R.2016–1 which refers to the Guidelines, will remedy this situation.

opportunity taken, to present objections at the hearing. The Fulbright application will be granted in part, permitting the employment of Fulbright *nunc pro tunc* to defend Schroder's work and seek compensation from the estate.

The court now turns to an examination of the reasonableness of the fees and expenses charged by Fulbright, which total $41,936.25 for 147 hours in compensation and $3,055.03 in reimbursement of expenses. The court has concluded above that it will make no award of fees relating to the retention of Schroder, including seeking the approval of that retention in fending off the sole and somewhat half-hearted objection raised by the former owner of the debtor. The court identifies 58 hours for a total of $17,701.25 devoted to retention matters and $1,857.47 in expenses related to those services. These sums will be disallowed.

■ Paragraph 4 of the Guidelines provides that reasonable fees may be allowed for preparation of a fee application. The UST notes that Schroder requests $9,307.50 for 40.50 hours spent by Fulbright preparing the Fee Application. The UST comments that this amount is excessive in light of the fact that Schroder's compensation is based upon a percentage of the sale price and the Fee Application does not contain detailed daily time entries. This court agrees with the UST, finds the total charge of $9,307.50 to be excessive and will reduce these fees by 50%, for a disallowance of $4,653.75.

■ The UST found the following expenses of Schroder extravagant: $265.08 for limousine service on June 25, 1996; movies-$8.35 on June 24, 1996; beer-$ 7.59 on July 8, 1996; beer-$ 7.00 on May 12, 1996. The court agrees that these expenses are extravagant and not compensable under the Guidelines. *See* para. 29, "Luxury dining or accommodations are not reimbursable"; para. 31, "Charges for entertainment, alcoholic beverages ... are generally not reimbursable." Therefore, the court disallows a total of $288.02 in asserted expenses.

Because the Fee Application was filed prior to the final December 23 hearing, some estimated charges by Fulbright are included. Those charges consist of 13.00 hours by Mr. Rochelle totaling $4,550.00 and $1,000.00 for travel related expenses for the December 23 hearing. The court will allow $4,550 for Mr. Rochelle's services. The travel expenses of $1,000.00 will be disallowed. The disallowed expenses will be reconsidered upon receipt of supporting documentation.

Schroder also included estimated expenses for the December 23 hearing. Those expenses are $1,768.00 for airfare, $65.00 for the rental car and $50.00 for cabfare. The court will allow the rental car and cabfare expenses. The airfare expense of $1,768.00 will be disallowed and reconsidered upon receipt of supporting documentation.

Therefore, the court will enter an order allowing total reimbursement of expenses for Schroder of $32,195.85. This total is comprised of fees and expenses incurred by Fulbright in the amount of $19,778.81 ($44,991.28 total requested less $17,701.25, $4,653.75, $1,857.47 and $1,000.00) and expenses incurred by Schroder of $12,417.04 ($14,413.06 requested less $228.02 and $1,768.00).

An order embodying the foregoing Conclusions of Law shall issue forthwith.

### ORDER

For the reasons set forth in the accompanying Memorandum of Decision,

IT IS THE ORDER OF THIS COURT that the Application for Compensation filed by Schroder Wertheim & Co. for final compensation for the sale of the Prototype Division is allowed in the amount of $225,000 for fees and $32,195.85 in reimbursement of expenses.

IT IS THE FURTHER ORDER OF THIS COURT that the Application filed by Schroder Wertheim & Co. for retention of Fulbright & Jaworski as counsel *nunc pro tunc* is granted in part and denied in part.